UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

GINA MCLEOD,

        Plaintiff,

    v.

BANK OF AMERICA, N.A.,

        Defendant.

Case No. 16-cv-03294-EMC

**ORDER GRANTING PLAINTIFF'S MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL**

Docket No. 29

Plaintiff Gina McLeod was a Mortgage Loan Officer for Defendant Bank of America from February 2014 to November 2016. She alleges the Bank failed to reimburse her and other loan officers for use of their personal vehicles in violation of California Labor Code § 2802 and a derivative claim under the California Unfair Competition Law (UCL), Business & Professions Code § 17200 *et seq.* Plaintiff acknowledges that Defendant has a facially-valid written policy, but argues that the Bank failed to exercise due diligence to reimburse putative class members despite having constructive knowledge they incurred mileage expenses. Alternatively, Plaintiff argues that Defendant had a *de facto* policy or practice of not reimbursing Loan Officers for routine mileage.

Plaintiff proposes the Court certify the following class pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure:

> All persons who are or have been employed, at any time from May 9, 2012 through the date of the Court's granting of class certification in this matter, by Bank of America, National Association ("Bank of America") in California under the job titles Loan Officer, Senior Loan Officer, Mortgage Loan Officer, Senior Mortgage Loan Officer, and Senior Lending Officer (collectively "Loan Officers" or "Class Members").

Bank of America has identified 1,881 individuals who would fall under this class definition up to July 2017.

For the reasons below, Plaintiff's motion is **GRANTED**. The parties shall appear at a

Case Management Conference on **January 18, 2018 at 10:30am** and must submit a joint case management statement 7 days prior to the hearing.

## I.   **FACTUAL BACKGROUND**

A.    Loan Officer Job Duties

Bank of America's Loan Officers sell mortgage loan products.  Stipulation No. 1.  They are based either at retail "Financial Center" locations (where they make "enterprise" sales directly to customers who walk in seeking a loan) or at "Home Loan Offices" (HLOs) (where most Loan Officers are based, but where they must engage in "self-sourcing" activity to identify sales). Sarris Decl. ¶ 3.  Loan Officers based at HLOs need to travel off-site to meet with prospective clients, either at Financial Centers or at another client location.  Loan Officers may also need to cover for absent employees at the Financial Centers.  The Bank acknowledges that driving a personal vehicle for either purpose is reimbursable under its policies (explained below).  Sarris Decl. ¶ 4; Al-Zouhbi Depo. 41:5-19.

In addition, the Bank acknowledges a variety of other activities that may involve reimbursable mileage, including "driving to mandatory training sessions, . . . driving to engage in self-sourcing sales activity such as attending open houses, town hall meetings, purchase closings, client meetings, and networking events."  Sarris Decl. ¶ 4.

Loan Officers have a degree of independence in pursuing self-sourcing activities.  *See* Stip. No. 4.  The Bank claims that Loan Officers are "not required to notify their manager in advance when engaging in self-sourcing sales activity, and pre-approval is not necessary to obtain reimbursement for business-related mileage."  *Id.* ¶ 9.  Their independence is underscored by the Bank's acknowledgement that "[g]enerally speaking, a Loan Officer's manager would likely be aware at a high level that the Loan Officer was engaging in self-sourcing activity, but would not have (or need) significant detail about this activity."  *Id.*  Though managers may not be aware of every specific self-sourcing sales activity, it is undisputed that Loan Officers are expected to pursue such activities to perform their jobs.  Those activities undisputedly involve activities out of the office, and hence travel.

That out-of-office activities were central to the performance of the Loan Officers' job is

highlighted by the fact that, up to November 2016, Bank of America classified all Loan Officers as exempt employees pursuant to the "outside sales exemption." Kaufmann Decl., Ex. 17 (Defendant's Amended Response to Interrogatory, No. 19). Under California law, that exemption applies when an employee spends more than half of his or her time away from the place of business to make sales. *See* Industrial Welfare Com., Wage Order No. 4-2001 (Jan. 1, 2001), Cal. Code Regs., tit. 8, § 11040, subd. 1(C).

B.    Stipulated Facts

The parties have also stipulated to a number of facts as evidence. Kaufman Decl., Ex. 1 (Docket No. 29-1) ("Stipulation"). The most relevant are:

- Stipulation 2: "To fulfill the sales role, Bank of America expects its loan officers to meet in person with clients and prospective clients. These meetings can and do take place both at Bank of America facilities and – particularly prior to November 2016 – at locations outside of Bank of America facilities."

- Stipulation 3: "In order to increase sales of mortgage loan products, Bank of America encourages its Loan Officers to engage in self-sourcing sales efforts, which may include, where appropriate, meeting with title company employees, realtors, and other financial services providers, attending open houses for homes on the market, attending Chamber of Commerce and other community meetings; these sales efforts can and often do take place outside of Bank of America facilities."

- Stipulation 5: "Bank of America is aware that most Loan Officers use their personal vehicles for work-related travel, including travel related to sales efforts during the workday."

C.    The Bank's Expense Policies

The Bank has maintained a written policy called the "Global Expense Standard" for all employees, including Loan Officers, throughout the class period. The policy states that mileage incurred for business purposes on personal vehicles is expensable/reimbursable. *See, e.g.,* Kaufman Decl., Ex. 3. The most recent language states, in relevant part:

> Manager approved personal mileage reimbursement is expensed via Concur [a computer system]. A mileage log is required with submission of the expense report. Mileage for commuting from home to office is not reimbursable. For business travel that begins at home, normal commuting miles to the office cannot be included in total miles for reimbursement. Only mileage is reimbursable, not fuel.

1    *Id.* Defendant's designated representative testified at her deposition that this policy means that

2    claimants will be reimbursed at the IRS mileage rate, which includes fuel costs.  Al-Zouhbi Depo.

3    35:2-36:2.

4    D.    The Bank's Efforts to Reimburse Mileage Expenses

5           The Bank argues it has undertaken several company-wide efforts to reimburse Loan

6    Officers for mileage incurred.  For example, Bank employees may report any expense through a

7    system called Concur.  Every Loan Officer is also issued a corporate credit card; expense reports

8    regarding use of the corporate credit card must also be filed with Concur, and the Bank maintains

9    that the Concur system makes it easy to report mileage in connection with any expense incurred on

10   the corporate card.  The Bank also stresses that its expense policy is visible to its employees

11   through its internal network, Flagscape.  Sarris Decl. ¶ 5.  New Loan Officers are also provided

12   with the expense policy upon hire, and Loan Officers must acknowledge they received and

13   understood the policy when they receive their corporate credit card, *id.* ¶ 5, or file expense reports.

14          However, the Bank's system-wide efforts to reimburse appear to be limited to the existence

15   of a policy, the existence of an expense protocol, and dissemination of the policy upon hire.  The

16   Bank, for example, admits it "has not conducted any study, audit, or analysis of how many miles

17   Loan Officers drive their own personal vehicles for work purposes."  Stip. No. 6.  Plaintiff also

18   points out that the Bank's budget process does not account for anticipated or actual mileage

19   incurred by Loan Officers.  *Id.* 78:2-79:17; 86:21-87:3; 87:23-88:5.   Aside from promulgating and

20   making its expense policy available to Loan Officers, the Bank does not engage in any class-wide

21   efforts to encourage reimbursement requests or to reimburse employees it knows have incurred

22   expenses.  Al-Zouhbi Dep. 59:2-60:5, 61:15-62:7; 57:14-19; 67:1-5.  For example, it does not train

23   or give guidance to Loan Officers' managers or sales assistants regarding mileage

24   reimbursements.  Al-Zouhbi Dep. 31:22-33:3; 65:14-68:10; 99:1-19.  Rather, the Bank relies on

25   self-reported expenses through Concur.

26   E.    Data on Reimbursements and Expert Analysis

27          Plaintiff offers the analysis of Dwight D. Steward, Ph.D, an economist and statistician, to

28   support her motion.  *See* Docket No. 29-3.  Dr. Steward was asked to examine Plaintiff's theory of

liability and estimate the amount of unreimbursed mileage. *Id.* at 5. His analysis is based on a class list and business reimbursement data produced by Defendant that shows the type, date, and amount of expense reimbursed to Loan Officers between September 19, 2011 to July 29, 2017. The data reflects reimbursements for mileage, parking, and toll charges. *Id.* at 6. The data shows that during the class period, there were a total in $142,216 of business reimbursements for mileage, $52,625 for parking, and $1,294 for toll charges. *Id.* Thus, on average, class members received 2.4 cents in mileage expense reimbursements per week. *Id.* at 7. Using the IRS reimbursement rate for 2012 (the first class year) of 55.5 cents per mile, that amounts to reimbursement for less than four-hundredths of a mile, or approximately 76 yards of travel per week. Moreover, only 30.5% of class members (573 out of 1,881) ever received a mileage reimbursement during their tenure. *Id.* In light of the expectation that Loan Officers engage in outside sales activities, this number, on its face, suggests at the very least a high rate of non-reimbursement.

Dr. Steward points to two specific data points which support the conclusion that class members have incurred unreimbursed expenses. First, there are 1,811 instances in the data in which class members were reimbursed for parking expenses. Dr. Steward argues it is fair to infer that there should be an associated mileage expense with those parking expenses because the Bank does not reimburse for parking next to the workplace. *Id.* at 8-9, ¶¶ 16-17. However, concurrent mileage reimbursements did not occur in 85.1% of those instances, and did not occur within 90 days in 74.4%. *Id.* at 9, ¶ 17. Second, there are 70 instances of toll road fee reimbursements. Yet, in 30% of those instances, the class member did not receive a mileage reimbursement either concurrently or within 90 days, although one would be expected because payment of a toll implies use of a car. *Id.* at 9, ¶ 18. These findings further tend to show that mileage has been incurred for which putative class members have not been reimbursed.[1]

---

[1] Defendant claims that Dr. Steward's conclusion that there was no concurrent mileage reimbursement lacks foundation because mileage expenses may be processed separately from parking/toll expenses, and may not be readily identifiable because they can be "lumped together as 'business mileage.'" Opp. at 12, n.13. However, Plaintiff points out that Dr. Steward accounted for the possibility of separate processing by analyzing reimbursement data for a period of 90 days following the parking/toll reimbursement. Reply at 8, n.3. With respect to "lumping," Plaintiff

Dr. Steward also claims that the number of reimbursements is below what would be expected if, as Defendant stipulated, "most" class members used their personal vehicles for travel. Only 30.5% of class members were actually reimbursed, when, using a conservative interpretation of "most," at least 51% would reasonably have been expected to be reimbursed. *Id.* at 10.[2]

Finally, Dr. Steward proposes a survey methodology for establishing class-wide liability and estimating damages. With respect to liability, he proposes surveying a statistically representative sample of class members about the existence of unreimbursed mileage they may have incurred based on a random sampling methodology that would account for any possibly potent variations, such as work location. *Id.* at 10-16. With respect to damages, he proposes a similar sampling approach that would involve surveying individuals about typical travel mileage combined with observational approaches like measuring distances with GPS applications or other means. *Id.* at 16-17. The specific approach, however, cannot be designed until the full universe of available information is understood and investigated. *Id.*

F.    Class Member Declarations

Plaintiff presents 8 declarations from putative class members (including Plaintiff) working in different offices and different regions across California.[3] The declarations are unanimous in

---

claims that mileage reimbursements cannot be lumped together with parking and toll reimbursements because they are separately categorized in the data. *Id.* Defendant's concern, however, appears not to be that mileage could have been lumped with some other expense, but that mileage related to several trips could have been lumped in one trip. Even so, that would be accounted for by Dr. Steward's review of 90 days after the parking/mileage expenses. Thus, Dr. Steward's inferences appear to be sound.

[2] Dr. Steward claims that there is less than a 1 in a trillion probability that this difference would be generated by random chance. *Id.* Defendant does not address this proposition which, in any case, is not necessary for the Court's holding. However, in the future, the parties are advised that claims about statistical significance should be presented with sufficient information for the Court to understand the legal significance of the alleged statistical significance. In other words, it is not clear if Dr. Steward is suggesting that Defendant's failure of due diligence, rather than chance, explains the discrepancy, and, if so, what the basis for that assertion is.

[3] One of the declarants, Glennis Morris, says he began working for the Bank in 1998 and retired in October 2017. Morris Decl. ¶ 2. However, Defendant claims that he has been on continuous leave of absence since 2008 and therefore has nothing probative to say about the class period. Al-Zouhbi Decl. ¶ 11. Plaintiff does not contest Defendant's claim. Accordingly, the Court gives no weight to the Morris declaration for purposes of this motion.

6

claiming that the Loan Officers were not aware their mileage could be expensed under the company's written policy and had not been instructed to make reimbursement requests for mileage.[4]  One declarant claims that a manager or sales assistant explicitly represented that mileage was not reimbursable, McLeod Decl. ¶¶ 13,[5] and another declarant claims that managers made statements about expense control that had the effect of discouraging such requests, Calaguas Decl. ¶¶ 9-10.[6]  All declarants report regular use of their vehicles for business purposes like transportation between branch offices, meetings with clients, attending events to network with potential clients, and so on, ranging from dozens to hundreds of miles per week.[7]

G.    Defendant's Declarations

Defendant submits declarations from 3 managers who have supervised Loan Officers[8] and who affirm the following points:

- That the Bank's policy is to reimburse for mileage expenses related to legitimate activities.[9]

- That managers are not necessarily aware of every single trip made by a Loan Officer in their personal vehicle, though they generally expect them to use their vehicles on the

---

[4]  McLeod Decl. ¶ 14; Barin Decl. ¶¶ 4-6; Bazurto Decl. ¶ 8; Calaguas Decl. ¶¶ 8, 11; Knowles-Hill Decl. ¶¶ 5-6; Winsanjen Decl. ¶¶ 4-6; Delgado Decl. ¶ 8.

[5]  The Bank submits a declaration from Mike Zak, McLeod's supervisor, claiming that the March 2016 e-mail from McLeod's sales assistant Bernadette Carranca has been misinterpreted, and that to the extent it says mileage was not reimbursable, it was inconsistent with company policy.  Zak Decl. ¶¶ 4-7.  Zak also discusses Carranca's intentions in sending the e-mail, but Plaintiff correctly points out that he does not present a proper foundation for knowledge of her subjective intentions and his commentary constitutes speculation.  Reply at 13, n.6; Fed. R. Evid. 602, 701.

[6]  Calaguas claims that his manager, Ann Thompson, stated at a sales meeting that their "draw" "covered our lending and realtor partner business including specifically our work related mileage." Calaguas Decl. ¶ 9.  Ann Thompson denies making the statement.  Thompson Decl. ¶ 3.  She further states that to the extent she made statements about "expense control" at meetings, they "were meant to convey to employees that they should be responsible and judicious with the Bank's funds, as they would be with their own money—not to suggest that certain expenses would not be reimbursed."  Thompson Decl. ¶ 4.

[7]  McLeod Decl. ¶ 8; Barin Decl. ¶ 1; Bazurto Decl. ¶ 5; Calaguas Decl. ¶ 5; Knowles-Hill Decl. ¶ 3; Winsanjen Decl. ¶ 3; Delgado Decl. ¶¶ 5-7.

[8]  Sarris Decl. ¶ 1; Watt Decl. ¶¶ 1-2; Flavetta Decl. ¶ 1.
[9]  Sarris Decl. ¶ 2; Flavetta Decl. ¶ 6.

job.[10]

- That they have consistently approved or never denied requests for mileage reimbursements.[11]

## II.   **LEGAL STANDARD**

### A.   Rule 23

Under Rule 23, a party seeking certification must demonstrate that: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).

In addition, a party seeking class certification must demonstrate that one of the subsections of Rule 23(b) applies. Plaintiff invokes Rule 23(b)(3), which provides that a class that meets the requirements of Rule 23(a) may be certified where "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

### B.   California Labor Code § 2802(a)

Under California law, an "employer shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties. . . ." Labor Code § 2802(a). The elements of a claim under Section 2802 are: (1) the employee made expenditures or incurred losses; (2) the expenditures or losses were incurred in

---

[10]  *See*, *e.g.*, Sarris Decl. ¶ 9 ("Generally speaking, a Loan Officer's manager would likely be aware at a high level that the Loan Officer was engaging in self-sourcing activity, but would not have (or need) significant detail about this activity."); Watt Decl. ¶ 5 ("I expect that Loan Officers will incur business expenses in carrying out their job responsibilities, including for self-sourcing activities."); Watt Decl. ¶ 5 (stating he was "aware that Loan Officers on my team generally use their personal vehicles for work-related reasons, if a Loan Officer did incur work-related mileage and did not submit an expense report seeking reimbursement for that mileage, I would typically have no way of knowing" because loan officers set their own schedules); Flavetta Decl. ¶ 7 ("In general, I do not know what self-sourcing sales activities the Loan Officers I manage are engaged in, nor do I direct Loan Officers to engage in specific self-sourcing sales efforts.").

[11]  Watt Decl. ¶¶ 5-6; Flavetta Decl. ¶ 9.

direct consequence of the employee's discharge of his or her duties, or obedience to the directions of the employer; and (3) the expenditures or losses were reasonable and necessary. *Marr v. Bank of Am.*, No. 09-CV-05978 WHA, 2011 WL 845914, at *1 (N.D. Cal. Mar. 8, 2011) (citing *Gattuso v. Harte-Hanks Shoppers, Inc.*, 42 Cal.4th 554, 568 (2007)). Further, this Court has held that an employee's failure to submit a request for reimbursement does not waive his or her rights under Section 2802. Rather, when the employer "know[s] or has reason to know that the employee has incurred an expense," then "it has the duty to exercise due diligence and take any and all reasonable steps to ensure that the employee is paid for the expense." *Stuart v. RadioShack Corp.*, 641 F.Supp.2d 901, 904 (N.D. Cal. 2009).

Defendant notes, in passing, that it does not concede the correctness of the *Stuart* rule, but it does not cite any supporting case-law to the contrary. Defendant's argument against applying the *Stuart* standard, being nothing more than a passing remark, is deemed a waiver for purposes of this motion. *See Maldonado v. Morales*, 556 F.3d 1037, 1048 n.4 (9th Cir. 2009) ("Arguments made in passing and inadequately briefed are waived."). Even if it were not waived, the Court adheres to *Stuart*. The vast majority of federal courts have followed *Stuart*'s interpretation of California law.[12] Accordingly, for purposes of this motion, the Court will apply the *Stuart* standard.[13]

---

[12] *See*, *e.g.*, *Green v. Lawrence Serv. Co.*, 2013 WL 3907506, at *10 (C.D. Cal. Jul. 23, 2013) (holding that "[t]he analysis in *Stuart* is persuasive"); *Morse v. ServiceMaster Global Holdings Inc.*, 2011 WL 2470252, at *3 (N.D. Cal. Jun. 21, 2011) (following *Stuart*); *Piccarreto v. Presstek, LLC*, 2017 WL 3671153, at *3 (C.D. Cal. Aug. 24, 2017) (same); *Greer v. Dick's Sporting Goods, Inc.*, 2017 WL 1354568, at *10 (E.D. Cal. Apr. 13, 2017) (same); *Casey v. Home Depot*, 2016 WL 7479347, at *26 (C.D. Cal. Sep. 15, 2016) (same); *Sinohui v. CEC Entertainment, Inc.*, 2016 WL 3475321, at *10 (C.D. Cal. Mar. 16, 2016) (same); *Tokoshima v. Pep BoysManny Moe & Jack of Cal.*, 2014 WL 1677979, at *8 (N.D. Cal. Apr. 28, 2014) (same). One federal court has disagreed with *Stuart*, imposing instead an even stricter rule against employees – holding that Section 2802 imposes strict liability on employers even without notice. *See Espinoza v. West Coast Tomato Growers, LLC*, 2016 WL 4468175, at *4, n. 2 (S.D. Cal. Aug. 24, 2016) (criticizing *Stuart* for "conceiving" of a notice requirement when one does not appear in the statute, and holding that "[t]he duty to reimburse does not need to be triggered by notice, actual or constructive" but rather "exists so long as the uncompensated employee expenditures or losses are reasonably necessary to the work").

[13] In *Cochran v. Schwan's Home Serv., Inc.*, 228 Cal.App.4th 1137, 1144 (2014), the California Court of Appeals interpreted Section 2802 to require an employer to reimburse employees who use their personal cellphones even when they have not incurred an extra expense through such use, because otherwise the employer would "receive a windfall" by "passing its operating expenses on

# III.  DISCUSSION

Plaintiff's UCL claim is entirely derivative of her § 2802 claim.  Therefore, for all practical purposes, the certifiability of the § 2802 claim will determine the certifiability of the UCL claim.  Accordingly, the Court's analysis will focus on the § 2802 claim.

A.  Rule 23(a)(1): Numerosity

There is no dispute that the class includes at least 1,881 individuals, well above the forty-person threshold for numerosity.  *See Rannis v. Recchia*, 380 F. App'x 646, 651 (9th Cir. 2010).  Thus, numerosity is met.

B.  Rule 23(a)(2): Commonality

Commonality "requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'"  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349-50 (2011) (citation omitted).  It does not suffice that "they have all suffered a violation of the same provision of law."  *Id.* at 350.  Rather, the "claims must depend upon a common contention" which "must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Id.*  In other words, "[w]hat matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation."  *Id.* (quoting Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U.L.Rev. 97, 132 (2009)).

Plaintiff maintains that Defendant's liability under § 2802 can be resolved in one stroke because (1) Defendant's constructive awareness of mileage incurred is based on common evidence regarding the Loan Officers' common loan duties and Defendant's common expectations; (2) the mileage sought is the mileage that was incurred in pursuit of duties shared by all Loan Officers; (3) the mileage was reasonable and necessary in light of those duties and Defendant's expectations.  Plaintiff also argues that whether Defendant exercised due diligence and took all

---

to the employee."  *Stuart* is consistent with *Cochran*'s holding that Section 2802 is designed to ensure an employer does not receive a windfall by passing its operating expenses onto its employees.

reasonable steps to ensure that Loan Officers were paid for their mileage is another common question that can be resolved in one stroke. In the alternative, Plaintiff claims that whether the Bank had a *de facto* policy of not reimbursing Loan Officers (notwithstanding its facially-valid written policy) can be determined on a class-wide basis through statistical analysis of the Bank's data and the use of representative evidence.

As a threshold matter, however, in light of Defendant's facially valid written reimbursement policy, Plaintiff must first present evidence of a widespread practice by which Loan Officers were not reimbursed for mileage incurred. Absent such a practice, there can be no knowledge or constructive knowledge of a problem. The Court evaluates that issue before turning to analysis of the common legal questions.

1.    Evidence of Common Practice of Unreimbursed Mileage

Plaintiff has presented substantial evidence of a widespread practice of not reimbursing Loan Officers for mileage incurred.

First, in light of the Bank's stipulations, it is obvious that Loan Officers were expected to use their vehicles to discharge essential duties, like traveling between bank facilities (*e.g.*, to cover for another employee) or pursuing self-sourcing sales activities (*e.g.*, attending client meetings, networking events, and so on). Out-of-office activities are inherent in the affected jobs. Indeed, the Bank stipulated that it was actually "aware" that "most" Loan Officers used their personal vehicles for such purposes.

Second, Dr. Steward's analysis suggests that Loan Officers were reimbursed, on average, for only 2.4 cents of mileage per week during the class period, approximately 76 yards of travel a week. But most people do not use an automobile to travel a mere 76 yards. Plaintiff's declarants claim to have incurred average weekly mileage much higher than that amount, and Defendant has not challenged their claims. *See* McLeod Decl. ¶ 11 (200-300 miles weekly); Bazurto Decl. ¶ 6 (20-40 miles weekly); Winsjansen Decl. ¶ 3 (100 miles weekly); Knowles-Hill Decl. ¶ 4 (30 miles weekly); Calaguas Decl. ¶ 6 (50-75 miles weekly); Barin Decl. ¶ 3 (100 miles weekly); Delgado Decl. ¶ 6 (50-60 miles weekly).

Third, the data shows that only 30% of class members ever received *any* reimbursement

11

for mileage expenses during the class period. A conservative interpretation of the Bank's stipulation that "most" Loan Officers used their personal vehicles would thus suggest that a substantial portion of the class were never reimbursed for mileage actually incurred. The evidence suggests, however, that the actual rate of non-reimbursement for actual expenses is likely much higher, in light of the regular use of vehicles by Loan Officers and the very low rate of reimbursement. And the data points discussed above regarding tolls and parking claims unaccompanied by mileage claims underscore the likelihood of a systemic practice of non-reimbursement.

Thus, Plaintiff presents substantial evidence of a common, class-wide practice of non-reimbursement for mileage incurred.

### 2. Common Evidence of Constructive Awareness of Incurrence of Reimbursable Expenses

To prevail under Section 2802, a plaintiff must show that the employer "knew or had reason to know the expense was incurred." *Stuart*, 641 F.Supp.2d at 903. Such actual or constructive knowledge, in turn, requires the employer to "exercise due diligence to ensure that each employee is reimbursed." *Id.*

Plaintiff has offered substantial evidence that routine use of a personal vehicle is intrinsic to the Loan Officer position. The Bank was not only aware that Loan Officers routinely used their personal vehicles, but indeed encouraged them to do so. In fact, off-site travel was so routine that Loan Officers generally did not review their day-to-day plans with managers. *See*, *e.g.*, Sarris Decl. ¶ 9 (acknowledging that "a Loan Officer would not need to seek approval or check in with his or her manager prior to attending an open house for business reasons" and a manager "would likely be aware at a high level that the Loan Officer was engaging in self-sourcing activity, but would not have (*or need*) significant detail" (emphasis added)). Additionally, prior to November 2016, the Bank classified loan officers as exempt pursuant to the "outside sales" rule, which applies when an employee spends more than half of his or her time outside the place of business pursuing sales. Out-of-office work (constituting at least half of the employees' time) could reasonably be expected to involve use of a personal vehicle.

1    There is substantial evidence that Loan Officers could not have performed their jobs

2    effectively without using their personal vehicles to pursue self-sourcing sales activities.  As noted

3    above, there is significant proof that Loan Officers have received reimbursements far below what

4    would be expected in light of their job duties, including self-sourcing sales activities.  Not

5    surprisingly, Defendant has stipulated that it is "aware" that "most" loan officers used their

6    personal vehicles to pursue those activities.  In sum, Plaintiff has presented common evidence

7    regarding whether Defendant knew or should have known that Loan Officers were incurring

8    mileage expenses, and whether Defendant knew or should have known that Loan Officers were

9    not being reimbursed for those expenses.

10    Defendant's only argument against commonality is that to satisfy commonality under Rule

11    23(a), Plaintiff must demonstrate that Defendant had knowledge of *each* and *every* employee's

12    specific expenses, *i.e.*, the details of every single trip taken with a personal vehicle.  Defendant's

13    argument is meritless.  Application of the duty of diligence under § 2802 does not require

14    knowledge or constructive knowledge of every instance of a reimbursable expense.  No case has

15    so interpreted § 2802.  The duty of due diligence is generally fulfilled when an employer

16    adequately undertakes systemic efforts to ensure all employees are reimbursed (*e.g.*, through

17    promulgation of policies, companywide training, etc.), and is triggered when an employer is aware

18    or constructively aware that reimbursable expenses are incurred regularly.  In other words, the

19    systemic duty is triggered by constructive knowledge of a systemic problem.  Thus, for instance,

20    in the analogous context of off-the-clock work claims, the court in *Jimenez v. Allstate Ins. Co.*,

21    2012 WL 1366052 (C.D. Cal. Apr. 18, 2012) certified a class of employees alleging that company

22    policies resulted in under-compensation for off-the-clock work.  The court emphasized that

23    "Plaintiff need not demonstrate that every manager knew every time an employee worked off-the-

24    clock," *id.* at 20, rejecting the employer's argument to the contrary.  "[I]nstead, plaintiff can

25    demonstrate that Defendant should have known that its employees were *regularly* working off-

26    the-clock as a result of [various policies and practices common across the class]."  *Id.* (emphasis

27    added).  The Ninth Circuit affirmed.  *See* 765 F.3d 1161, 1166 (9th Cir. 2014), *cert. denied*, 135

28

S.Ct. 2835 (2015).[14]

Similarly, here, Plaintiff's theory of constructive knowledge is premised on class-wide evidence such as Loan Officers' common job duties, Defendant's stipulations, and class-wide data demonstrating a very low reimbursement rate in light of those duties. Plaintiff intends to argue that Defendant should have known Loan Officers were regularly incurring unreimbursed mileage expenses based on that common evidence. The answer to the question of what constructive knowledge may be imputed based on those common job duties and class-wide reimbursement data will be the same for every class member; a common question that drives the litigation obtains whether or not Defendant had actual knowledge of each and every employee's expenses.

Defendant cites *Stuart* to support an individualized knowledge requirement, but *Stuart* does not stand for that proposition. There, the Court denied plaintiffs' motion for summary judgment, holding that the evidence did not require a conclusion, as a matter of law, that Radio Shack was on notice of the mileage incurred simply because employees' trips between stores were recorded in a database, as plaintiffs had not identified which employees at Radio Shack were aware of the database entries. *Stuart*, 641 F.Supp.2d at 904-5. The issue on the merits concerned imputability of knowledge. The motion currently pending is for class certification, not summary judgment. Relevant to the question of class certification, this Court in *Stuart* held the issue of knowledge could be determined on a class-wide basis.

The other cases cited by Defendant are inapposite. For example, *Picaretto v. Presstek, LLC*, Case No. CV 16-1862, 2017 WL 3671153 (C.D. Cal. Aug. 24, 2017) involved

---

[14] Both parties debate whose position is supported by other off-the-clock work cases (which this Court cited as the basis for its knowledge requirement under Section 2802 in *Stuart*). The case-law supports Plaintiff's interpretation that constructive knowledge is permissible in that context. *See*, *e.g.*, *Forrestor v. Roth's I.G.A. Foodliner, Inc.*, 646 F.2d 413, 414 (9th Cir. 1981) (employer liable when "knows *or should have known* that an employee is or was working overtime" (emphasis added)). Defendant's citations acknowledge the same standard. *White v. Starbucks Corp.*, 497 F.Supp.2d 1080, 1083 (N.D. Cal. 2007) ("To prevail on his off-the-clock claim, [plaintiff] must prove that Starbucks had actual *or constructive* knowledge." (emphasis added)); *Koike v. Starbucks Corp.*, 2008 WL 7796650, at * (N.D. Cal. Jun. 20, 2008) *aff'd*, 378 F.App'x 659 (9th Cir. 2010) (same); *Brewer v. Gen. Nutrition Corp.*, 2014 WL 5877695, at *11 (N.D. Cal. Nov. 12, 2014) (same); *Plaisted v. Dress Barn, Inc.*, 2013 WL 300913 (C.D. Cal. Jan. 25, 2013) (same). Only *Koike* and *Brewer* involved class certification, and there, certification was defeated because plaintiffs could not demonstrate that class members worked off-the-clock simply because the employer "incentivized" it; the lack of individualized knowledge was not the issue.

reimbursement of an individual employee's relocation expenses; the case did not involve class claims or allegations of a systemic failure to reimburse, so the court had no occasion to consider how constructive knowledge may be proven on a systemic basis.

Defendant's reliance on *Wilson v. Kiewit Pacific Co.*, Case No. 09-03630, 2010 WL 5059522 (N.D. Cal. Dec. 6, 2010) is also misplaced. In *Wilson*, the court declined to certify a class of "all employees" challenging an employer's failure to provide "automatic" reimbursement for "all non-commute business mileage. *Id.* at *4. The plaintiffs in *Wilson* attempted to rely on *Stuart*. The *Wilson* court distinguished *Stuart* on the basis that, in *Stuart*, the Court had "found that RadioShack's database, recording the inter-store transfers that were the basis of the class claims, could provide common proof that RadioShack was put on actual notice of the fact that employees incurred mileage expenses," whereas the plaintiffs in *Wilson* had presented "no evidence . . . that defendant knew every time an employee incurred business mileage expenses." *Id. Wilson* involved a fundamentally different situation: there, the putative class covered "all" employees, whereas here, the putative class involves only Loan Officers with *common* job duties that form the basis of Defendant's alleged constructive knowledge. Here, Loan Officers could not have performed their job effectively without using their personal vehicles, and Defendant knew and encouraged them to do so – a showing that was not made in *Wilson*.

Thus, here, unlike in *Wilson*, there is common proof related to the core job duties; common proof related to the self-sourcing sales activities the Bank encouraged loan officers to undertake; common proof that "most" loan officers incurred mileage on their personal vehicles; and common proof that class-wide reimbursements were below what would reasonably be expected in these circumstances. In short, there was common proof of a sufficiently widespread systemic problem that arguably gave rise to constructive knowledge.

Thus, the facts of this case are much closer to *Melgar v. CSK Auto, Inc.*, in which this Court certified a class of employees who used their personal vehicles to make bank deposits where common company policies required employees to make daily bank deposits, the common policies envisioned use of a personal vehicle for that purpose, the company never made reimbursements unless an employee first requested one, and the company did not take any affirmative steps

15

system-wide to ensure employees were reimbursed absent a request. *See* No. 13-CV-03769-EMC, 2015 WL 9303977 (N.D. Cal. Dec. 22, 2015), *aff'd*, 681 Fed.Appx. 605 (9th Cir. Mar. 3, 2017) (holding "district court did not abuse its discretion by relying on its interpretation of [Section 2802] in finding the commonality requirement satisfied").

Plaintiff has therefore presented substantial evidence that whether the Bank had constructive notice under Section 2802 that Loan Officers were incurring mileage expenses and were not being reimbursed is a common question whose answer can be resolved on a class-wide basis.

### 3. Commonality and Due Diligence

Plaintiff's argument that Defendant failed to exercise due diligence is also premised on common evidence, such as Defendant's alleged failure to take any class-wide actions to facilitate reimbursements other than distributing its general reimbursement policy to Loan Officers at hiring and making it available on an internal website. At the hearing, Plaintiff's counsel suggested additional reasonable measures could have included, for example, a specific training for Loan Officers or their managers regarding the submission of mileage expenses under the expense policy; robotic e-mail reminders to submit mileage expenses; or a phone application to track Loan Officers' mileage. Whether Defendant's system-wide efforts are sufficient to satisfy the duty of due diligence under Section 2802 and whether Defendant's failure to adopt additional system-wide practices violates Section 2802 are common questions capable of class-wide resolution based on common evidence.[15]

Defendant claimed at the hearing that the due diligence inquiry does not present a common question because it requires an individualized analysis of every single employee's circumstances because, *e.g.*, some employees could have informed their managers of specific trips they were taking. The duty of due diligence, however, concerns the employer's actions, not any individual

---

[15] Defendant also claims there is no explanation what steps it reasonably should have taken vis-à-vis *all* Loan Officers to satisfy its requirement of due diligence, in light of the possibility that some class members may have "preferred" to claim their business mileage as a tax deduction. Opp. at 20-21. That a hypothetical class member may have "preferred" to claim their business mileage as a tax deduction does not inform the question whether Defendant failed to exercise due diligence.

employee's actions.  There is no evidence here that Defendant's due diligence vel non is to be evaluated by anything other than examining its systemic efforts relative to the class.  There is no evidence of widely varying efforts to ensure expenses were reimbursed.  The dispute appears to center on systemic policy and alleged shortcomings thereof.  Whether Defendant's existing class-wide practices are sufficient to satisfy its duty of due diligence is a common question whose answer is apt to drive resolution of the litigation.[16]

       4.    <u>Reasonable Necessity of Personal Vehicle Use</u>

Defendant argues that the reasonableness or necessity of each particular expense cannot be demonstrated on a class-wide basis because the inquiry is necessarily fact-specific.  *See Grissom v. Vons Co., Inc.*, 1 Cal.App.4th 52, 58 (1991) (under Section 2802, "ascertaining what was a necessary expenditure will require an inquiry into what was reasonable under the circumstances"); *Gattuso v. Harte-Hanks Shoppers, Inc.*, 42 Cal.4th 554, 568 (2007) (reimbursement due is based on "whether each of those expenses was 'necessary,' which in turn depends on the reasonableness of the employee's choices").  In particular, Defendant argues that most Loan Officer self-sourcing sales activities were self-directed,[17] which creates a possibility that "excessive distances and/or attendance (or frequency of attendance) at certain meetings or events may not be reasonably necessary to a Loan Officer's position, nor, in some circumstances, may it be reasonable to use a personal vehicle rather than a taxi or public transit."  Opp. at 11.

---

[16] It is conceivable that Defendant's defense would not be *limited* to the actions it took on a class-wide basis.  In other words, Defendant might argue that, notwithstanding the absence of class-wide policies or practices to reimburse employees sufficient to satisfy its duty of due diligence, there were some managers or some branch offices where additional measures were undertaken to ensure that employees were paid for their expenses and that the company satisfied its duty with respect to those employees.  Even if Defendant had presented evidence to show that such variations were real rather than hypothetical (which it did not), at most those variations would raise *additional* questions.  But they would *not* negate the common question.  Rule 23 "does not require that all questions of law or fact raised in the litigation be common."  *Dukes*, 564 U.S. at 369 (quotation and citation and omitted).  To the contrary, "[e]ven a single question of law or fact common to the members of the class will satisfy the commonality requirement."  *Id.* (quotation and citation omitted).  At best, any such claim goes to predominance, not commonality.

[17] Not all Loan Officer driving activities were self-directed, as suggested by Defendant at the hearing, however.  For example, Loan Officers were also required to attend mandatory trainings, and were also sometimes required to cover for other employees at facilities other than their home office.  Defendant acknowledges that such mileage was also reimbursable.

However, Plaintiff seeks reimbursement for mileage expenses that fall into a few discrete categories of travel which Defendant has already acknowledged are reimbursable under its policies: *i.e.*, traveling between bank facilities to attend meetings or to cover for other employees and pursuing self-sourcing sales activities. *See*, *e.g.*, Sarris Decl. ¶ 4 (acknowledging that loan officers "may incur reimbursable mileage in a variety of situations," including "driving to mandatory training sessions, driving to cover at Financial Centers, and driving to engage in self-sourcing sales activity such as attending open houses, town hall meetings, purchase closings, client meetings, and networking events"). So limited, whether such categories of trips were *prima facie* reasonably necessary to the discharge of the Loan Officers' duties is a common question that can be resolved on a class-wide basis. *See Tyson Foods, Inc. v. Bouaphakeo*, 136 S.Ct. 1036, 1045 (2016) ("[A] common question is one where the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." (citation and quotation omitted)); *see also Sinohui v. CEC Entertainment, Inc.*, 2016 WL 3475321, at *11 (C.D. Cal. Mar. 16, 2016) (whether mileage expenses incurred to go to the bank, pick up supplies, or attend fundraisers and meetings were reasonably necessary under Section 2802 could be resolved on a common basis where employer did not contest those duties were generally required of managers).

To the extent Defendant may dispute particular instances of mileage incurred by individual Loan Officers, that is an affirmative defense that relates more to predominance than commonality. *See*, *e.g.*, *Stockwell v. City and Cty. of San Francisco*, 749 F.3d 1107, 1114 n.3 (9th Cir. 2014) ("The availability of such [individualized affirmative] defenses . . . is not pertinent to the commonality question, as long as there is *a* common question as to the [plaintiffs'] prima facie case . . . ." (emphasis in original)); *Santomenno v. Transamerica Life Ins. Co.*, 310 F.R.D. 451, 461 (C.D. Cal. 2015) ("[C]ommonality is not defeated by the possibility that [a] claim requires a more individualized inquiry to consider defenses against certain class members."). Accordingly, the court addresses that issue in more depth in the predominance section below. As noted below, that prospective defense appears, in any case, to be speculative, as Defendant has not identified a single instance of mileage incurred which it claims was unreasonable or unnecessary. Instead, it

1  asserts that it paid *all* mileage reimbursements that have been requested.

2      Plaintiff's Section 2802 claim therefore meets the requirements of commonality.

3  C.    <u>Rule 23(a)(3): Typicality</u>

4      The claims and defenses of the representative parties must be "typical" of those of the

5  class. Fed. R. Civ. P. 23(a)(3). Typicality is satisfied "when each class member's claim arises

6  from the same course of events, and each class member makes similar legal arguments to prove

7  the defendant's liability." *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010).

8      Defendant claims that Plaintiff's claims are not "typical" because "her claim is

9  substantially based on her oral communications with one of her manager's [sic] and other Bank

10  employees," Opp. at 22, and claims based on oral communications are, supposedly, atypical as a

11  matter of law. It is true that a plaintiff's reliance on singular oral statements to prove the existence

12  of a policy may raise problems for both commonality and typicality where there is no showing that

13  such statements were part of a widespread practice or made according to a common script.[18]

14  However, at the hearing, Plaintiff expressly disavowed relying on oral communications to support

15  her primary theory of liability, which will be based instead on the common evidence discussed

16  above. Only if Plaintiff's primary theory fails will she seek class certification of her alternative

17  theory that Defendant maintained a *de facto* policy of non-reimbursement based in part on such

18  oral representations or other communications revealed in discovery.

19      Defendant also claims that Plaintiff's claim is atypical because she failed to read the

20  expense policy despite acknowledging it when she received her corporate card. At best, this

21  _____

22  [18] *Lanzarone v. Guardsmark Holdings, Inc.*, 2006 WL 4393465, at *7 (C.D. Cal. Sep. 7, 2006)
(plaintiff's uniform rates claim rested on an oral communication with one supervisor and was not

23  accompanied by evidence "that these alleged conversation(s) were conducted pursuant to a written
script or other standardized company policy"); *Cortez v. Best Buy Stores, LP*, 2012 WL 255345, at

24  *7 (C.D. Cal. Jan. 25, 2012) (no typicality where plaintiff's evidence of a policy of failure to
provide meal and rest breaks was based exclusively on conversations with her manager and there

25  was no evidence "that these oral conversations were standardized across [the class] pursuant to
some written policy or that some common method of proof could establish that this conduct

26  occurred"). *Cf. Compare Circle Click Media LLC v. Regus Mgmt. Grp. LLC*, No. 12-cv-04000-
EMC, 2016 WL 1048046, at *10 (N.D. Cal. Mar. 11, 2016) (holding that individual issues

27  predominate where plaintiff's liability theory regarding allegedly inadequate disclosure of fees in
leasing relationship was based not only on the *contents* of common documents, but also "on the

28  *way* the documents are *presented*, which includes the salesperson's pitch to the individual
customer").

would be an affirmative defense.  Thus, even if Defendant is correct that her failure to read the

policy is material to her ability to recover (thus far Defendant has failed to establish this would be

a valid defense), it would not affect the key common liability questions, such as whether the Bank

had constructive knowledge of the regular failure to reimburse expenses incurred and whether the

Bank satisfied its duty of due diligence by promulgating its expense reimbursement policy and

establishing the Concur expense-reporting system.  The answer to those questions depends not on

the actions of Plaintiff or individual Loan Officers, but *Defendant's* actions, and thus in respect

thereto, Plaintiff would be a typical and adequate representative.[19]

Similarly, Plaintiff's reliance on her Sales Assistant to file expense reports does not make

her atypical.  Plaintiff's case-in-chief regarding liability (Defendant's constructive knowledge and

due diligence) is unaffected by how Plaintiff filed her expense reports.  Nor has the Bank

presented any legal authority that reliance on a third person to file expense reports precludes an

employee from recovering under § 2802.  Thus, it appears to be immaterial whether she filed her

own reports or whether her sales assistant did so for her.  If anything, the Bank's 30(b)(6)

deponent stated that Sales Assistants were the "subject matter expert(s)" who help Loan Officers

prepare expense reports.  Al-Zouhbi Dep. 37:9-38:1.  If that is the case, Plaintiff's reliance on her

sales assistant relates more to the question whether Defendant exercised its duty of due diligence,

if even its "subject matter expert" was unaware that Loan Officer mileage expenses were

reimbursable.

---

[19]  Even if Plaintiff's failure to read the policy were relevant to a viable affirmative defense, it would not necessarily defeat typicality.  An affirmative defense defeats typicality only if there is "a danger that absent class members will suffer if their representative is preoccupied with defenses unique to [her]."  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1982) (quotation and citation omitted).  It is highly unlikely that this defense would be "unique" to Plaintiff.  The expense policy is a generic 113-page document that is applicable to *all* Bank of America employees world-wide regardless of job title, and discusses use of a personal automobile in only one paragraph on page 54.  *See* Kaufman Decl., Ex. 3 at 54.  There is a reasonable probability that a significant number of other Loan Officers, like Plaintiff, did not read the entire document, so they could face a similar defense.  Typicality is therefore not defeated, because many other class members would face the same prospective defense as Plaintiff.  *See Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1982) (typicality not met only where defenses "are not typical of the defenses which may be raised against other members of the proposed class"); *Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 534 (N.D. Cal. 2012) (typicality not defeated where employer's "defense against [named plaintiff] represents a key defense typical of claims it will raise against the class as a whole").

Defendant also suggests that Plaintiff, like other Loan Officers, may have preferred not to request reimbursement so that they could claim unreimbursed mileage on their taxes. To the extent Defendant suggests that other class members engaged in the same practice, the notion is not "unique" to Plaintiff and therefore not atypical. 976 F.2d at 508. More importantly, however, Defendant presents no legal authority suggesting that such a preference would constitute a viable affirmative defense to a claim under § 2802. Whether Plaintiff or others failed to notify Defendant or "deliberately prevented [Defendant] from acquiring knowledge" of their expenses is relevant *only if* Defendant had no knowledge of the expenses. *Forrester*, 646 F.2d at 414 (so holding in the overtime context). If Plaintiff demonstrates that Defendant had constructive knowledge of Loan Officers' mileage expenses, the issue is moot. Moreover, even if the defense were viable, however, it could be addressed at the damages phase and would not affect resolution of the common liability questions (constructive knowledge and due diligence).

Accordingly, Plaintiff's claims are typical of the class members she seeks to represent.

### D.    Rule 23(a)(4): Adequacy

The Bank does not contest that adequacy has been satisfied. However, because the Court has a fiduciary duty to absent class members, the Court must independently analyze the issue.

Adequacy evaluates whether the plaintiff and her counsel "have any conflicts of interest with other class members" and will "prosecute the action vigorously on behalf of the class." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). No conflicts are evident here, as all class members were Loan Officers who suffered the same alleged injury—*i.e.*, unreimbursed mileage expenses for a common set of activities (such as self-sourcing sales, travel between branches, and attending mandatory trainings). Although Loan Officers based at HLOs were more reliant on self-sourcing sales than those at Financial Centers, and were therefore more likely to engage in self-sourcing sale activities, that is a variation of degree, not of quality. All class members would still share an interest in being reimbursed for such trips. Moreover, here, Ms. McLeod has prosecuted the case by producing discovery, attending a mediation session, cooperating with her counsel, assisting in the investigation of claims, and preparing for and attending her deposition. Wynne Decl. ¶ 11; McLeod Decl. ¶¶ 3-5. There is thus no reason to

1   doubt her adequacy as a class representative.

2          Counsel is also adequate to represent the class. Its work thus far (including the complaint,

3   discovery, and class certification motion) demonstrate it has identified and investigated potential

4   claims, its knowledge of the applicable law, and that it has committed resources to representing

5   the class. Fed. R. Civ. P. 23(g)(1)(A)(ii), (iii), and (iv). Counsel has also prosecuted many wage-

6   and-hour actions, including expense reimbursement cases, and has committed to prosecuting this

7   case. *Id.* 23(g)(1)(A)(ii); *see* Wynne Decl. ¶ 2-10; Kaufmann Decl. ¶¶ 3-16.

8          The requirement of adequacy is therefore satisfied.

9   E.     Rule 23(b)(3): Predominance

10          In addition to fulfilling all the requirements of Rule 23(a), a party seeking to proceed on a

11   class-wide basis must satisfy one of the requirements of Rule 23(b). Under Rule 23(b)(3), a class

12   for damages may not be certified unless the Court finds that "questions of law or fact common to

13   class members predominate over any questions affecting only individual members." Fed. R. Civ.

14   P. 23(b)(3). Rule 23(b)(3) requires the Court to give "careful scrutiny to the relation between

15   common and individual questions." *Tyson Foods, Inc. v. Bouphakeo*, 136 S.Ct. 1036, 1045

16   (2016). "An individual question is one where members of a proposed class will need to present

17   evidence that varies from member to member, while a common question is one where the same

18   evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible

19   to generalized, class-wide proof." *Id.* (quotation and citation omitted). It is well-established that

20   predominance is not defeated merely because individualized inquiries will be required at the

21   damages stage of litigation, including consideration of affirmative defenses. *See*, *e.g.*, *Tyson*

22   *Foods.*, 136 S.Ct. at 1045 (common issues may predominate "even though other important matters

23   will have to be tried separately, such as damages or some affirmative defenses peculiar to some

24   individual class members" (quotation omitted)); *Jimenez v. Allstate Ins. Co.* ,765 F.3d 1161, 1168

25   (9th Cir. 2014) (affirming class certification where "the district court was careful to preserve [the

26   defendant's] opportunity to raise any individualized defense it might have at the damages phase of

27   the proceeding"), *cert. denied*, 135 S.Ct. 2835 (2015); *Leyva v. Medline Indus. Inc.*, 716 F.3d 510,

28   513-14 (9th Cir. 2013) ("[T]he presence of individualized damages cannot, by itself, defeat class

certification under Rule 23(b)(3); *see also* Newberg § 4:54 ("[C]ourts in every circuit have uniformly held that the 23(b)(3) predominance requirement is satisfied despite the need to make individualized damage determinations[.]").

Defendant argues that any common questions would be overcome by individualized inquiries such as "the nature of the travel at issue and whether anyone at the Bank had reason to know of each instance of travel; whether each Loan Officer ever submitted requests for mileage reimbursement; whether mileage expenses were lumped together on expense reports or listed separately for each trip; whether the Loan Officer was ever told to submit their mileage expenses, as well as the Loan Officer's familiarity with the Bank's Policy." Opp. at 24.

These issues do not defeat predominance. Many are irrelevant as a matter of law. Under *Stuart*, Plaintiff need only prove Defendant's *constructive* knowledge that mileage was being incurred without being reimbursed, not *actual* knowledge of each individual trip, as explained above. Further, under *Stuart*, Loan Officers are not required to show they requested reimbursements to prevail on their claims if they demonstrate the Bank knew or had reason to know expenses were incurred.[20] *Stuart*, 641 F.Supp.2d at 903-4; *cf. Forrester*, 646 F.2d at 414 (holding that employer is liable for off-the-clock work claim if it "knows or should have known" about it, "even if the employee does not make a claim for the overtime compensation").

Moreover, that a particular Loan Officer may have had reasons for affirmatively deciding not to request a reimbursement despite being aware that he or she could do so has no bearing on the question whether Defendant satisfied its requirement of due diligence based on its constructive knowledge of such expenses. If the employer had constructive knowledge of the expenses, then it

---

[20] Defendant cites two cases for the proposition that whether a request was submitted is relevant to its liability. Opp. at 2, n.2. However, one case does not discuss or apply the *Stuart* standard or discuss the issue of constructive knowledge. *Chavez v. Lumber Liquidators, Inc.*, Case No. CV-09-4812 SC, 2012 WL 1004850, at *10 (N.D. Cal. Mar. 26, 2012) (plaintiff did not show a policy of denying reimbursement requests for use of personal vehicles and cellular phones). The other denied certification of a class defined to include "employees who sought and did not receive reimbursement" because "Plaintiff failed to offer significant proof that Defendant had a uniform policy or practice of denying reimbursement." *In re AutoZone, Inc., Wage & Hour Emp't Practices Litig.*, 289 F.R.D. 526, 547 (N.D. Cal. 2012). In contrast, this case focuses on Defendant's alleged failure to satisfy its duty of due diligence, not its alleged denial of reimbursement requests.

is immaterial whether individual Loan Officers failed to notify the employer about the expense, deliberately or otherwise. *Cf. Forrester*, 646 F.2d at 414. The duty of due diligence is triggered by constructive knowledge, not an employee's notification about the expense. Thus, individualized inquiries would not be necessary with respect to individual Loan Officers' actions if Defendant is deemed to have constructive knowledge of the expenses. Even if it were a viable defense (and Defendant presents no legal authority suggesting that it is), however, it could be dealt with at the damages stage and would not defeat predominance. *Tyson Foods.*, 136 S.Ct. at 1045; *Jimenez*, 765 F.3d at 1168; *Leyva*, 716 F.3d at 513-14. Defendant has not presented any evidence suggesting that deliberate withholding of requests for reimbursement was a widespread phenomenon, and it seems unlikely that it would be; it stands to reason that an employee would prefer a dollar-for-dollar reimbursement rather than a less valuable tax deduction. In any case, whether Loan Officers claimed mileage expenses on their tax returns, at best, affects their relationship with the IRS, not whether Defendant owes them a reimbursement under California law. *See Dalton v. Lee Publications, Inc.*, 270 F.R.D. 555, 564 (S.D. Cal. 2010) (certifying class of employees seeking, inter alia, mileage reimbursements, and holding that whether class members deducted mileage on their taxes "is an issue between Plaintiffs and the IRS" that "has nothing to do with Defendant").

It is unclear what Defendant means with respect to "whether mileage expenses were lumped together." The adequacy of any particular request for reimbursement is immaterial where the theory of liability is not about the denial of requests that have been made, but the failure to reimburse notwithstanding the absence of a request. In any case, even if such individualized issues *were* at issue, they would not impede resolution of the common questions, but rather, would relate to damages (*i.e.*, what is reimbursable) and would be addressed through a damages claims process. *Leyva*, 716 F.3d at 513-14.

Additionally, whether an individual Loan Officer was told to submit their mileage expenses by another employee does not raise individualized issues. Plaintiff's counsel disavowed reliance on oral statements to prove class-wide liability, and plans instead to rely on common evidence of Defendant's practices and lack of efforts on a system-wide level. Plaintiff's prima

facie case thus will not require individualized inquiries into what any particular class member was told. *Compare Circle Click Media LLC v. Regus Mgmt. Grp. LLC*, No. 12-cv-04000-EMC, 2016 WL 1048046, at *10 (N.D. Cal. Mar. 11, 2016) (holding that individual issues predominate where plaintiff's liability theory regarding allegedly inadequate disclosure of fees in leasing relationship was based not only on the *contents* of common documents, but also "on the *way* the documents are *presented*, which includes the salesperson's pitch to the individual customer").

At best, whether any Loan Officer was told to submit expenses by another employee may relate to Defendant's potential defense that, apart from system-wide efforts, some managers at their own direction may have undertaken additional efforts to encourage Loan Officers to file mileage reimbursement requests. Thus, the argument would be that even if Defendant's system-wide efforts did not satisfy due diligence, the efforts of a manager at one particular branch may have satisfied that duty and that this could raise individual questions. At this time, however, Defendant has not presented evidence to support that theory other than isolated anecdotes[21] and speculation. Defendant has not shown such efforts by individual managers were real and widespread enough to create a large volume of individual inquiries so as to threaten predominance. Nor is there any evidence that any such manager's efforts made a difference; at

---

[21] Defendant submits three declarations from managers who claimed to have undertaken some effort beyond the system-wide efforts. At this point, these declarations do not support the existence of individualized issues. One declaration fails to claim that the extra effort addressed reimbursement of mileage, the key issue in this case. *See* Sarris Decl. ¶ 8 ("Approximately once a year, the team I oversaw as Southwest Division Business Support Manager for Home Loans would hold a divisional compliance call that included Loan Officers, managers, and sales assistants. During those calls we discussed the Bank's expense reimbursement policy."). A second declaration concerned reminders for only a small category of reimbursements (those related to coverage at offices other than a Loan Officer's home base) from only a single manager. *See* Flavetta Decl. ¶ 5 (when a Loan Officer is asked to cover at another office, "I remind the Loan Officer to submit an expense report for the mileage they incur in driving to the other Financial Center"). A third declaration from a single manager claimed to have a "practice" of informing Loan Officers that mileage from self-sourcing activities was reimbursable, with no details regarding what that "practice" consisted of. *See* Watt Decl. ¶ 5. These do not provide a sufficient evidentiary basis for the Court to believe that individualized issues will be involved and, even to the extent they do, there is no reason to believe they would be so numerous or substantial as to predominate over common questions; the Court determines that, given the relative insignificance of these isolated instances, such minor variations can be addressed during individualized hearings during the damages phase. However, if evidence later emerges suggesting more significant variations, the Court may entertain a motion to decertify or amend the class definition, or reconsider the appropriate process for addressing such issues.

this juncture, there is no evidence, *e.g.*, that reimbursement rates of particular officers or managers substantially varied from company-wide rates as a result of such efforts. If these efforts did prove to be material, they would be addressed during the damages phase. *See, e.g., Tyson Foods.*, 136 S.Ct. at 1045; *Jimenez*, 765 F.3d at 1168.

Finally, Defendant argues that individual issues would predominate with respect to whether each car trip was reasonably necessary to the discharge of each Loan Officer's duties. The Bank, however, presents no evidence to suggest that unreasonable or unnecessary trips are a real or widespread problem. It does not identify, for example, any specific examples of such unreasonable/unnecessary trips, nor does it identify any requests for mileage reimbursement that have been denied for that reason.[22] To the contrary, the Bank has only presented declarations from managers claiming they approved *all* requests for mileage reimbursement. Watt Decl. ¶¶ 5-6; Flavetta ¶ 9. Defendant itself describes its official policy in lenient terms, stating that "[a]ny mileage that [Loan Officers] have to incur doing [sic] the due course of business, whether that's meeting with realtors, whether that is going to open houses or on an open house caravan or any other meeting related to business," including "anything reasonably related to [Loan Officers'] business of increasing their sale of loans." *See* Al-Zouhbi Dep. 36:22-37: 8.

Thus, on this record, there is no reason to believe that the possibility of unreasonable or unnecessary trips is grounded in the realities of this case rather than merely hypothetical. Indeed, common sense suggests that Loan Officers who were not being reimbursed for their mileage would avoid unreasonable and unnecessary trips. Even if these issues were to arise, however, they would relate to damages and could be addressed at that stage. *See, e.g., Tyson Foods.*, 136 S.Ct. at 1045; *Jimenez*, 765 F.3d at 1168.

Accordingly, the Court concludes that common questions predominate over any

---

[22] The closest Defendant comes regards the declaration of putative class member Mr. Calaguas, who is based in San Francisco and attested that he used his personal vehicle. Defendant presented the declaration of Ann Thomas, who claims that most San Francisco employees use public transit or taxis. Thompson Decl. ¶ 6. Significantly, Ms. Thompson does *not* claim that Mr. Calaguas's personal vehicle use was therefore unreasonable or unnecessary.

individualized issues that may arise.[23]  If the record develops, however, to suggest that individualized issues turn out to be so numerous or so cumbersome that they overcome the common questions, the Court may revisit the issue.

F.      Rule 23(b)(3): Superiority and Manageability

Rule 23(b)(3) also considers: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action."

That common questions predominate demonstrates that a class action would be a superior method of adjudication.  *Stuart*, 2009 WL 281941, at *14; *Melgar*, 2015 WL 9303977, at *13. None of the criteria above weigh against proceeding as a class action: class members have minimal interest in pursuing independent suits considering the relatively small amount of individual damages (assuming unreimbursed mileage of 100 miles per week over an average 2-year tenure would amount to approximately $5,500 per class member); there does not appear to be other individual litigation underway that would be disrupted; there is nothing undesirable about concentrating California claims in this forum; and the difficulties that could arise can be adequately managed as discussed above.

Moreover, although neither party addressed the question of how trial should proceed, there are a variety of methods available to the Court to ensure that the proceedings are manageable.

_____

[23]  Defendant cites a number of cases that are not on point.  *Garcia v. Sun Pac. Farming Co-Op*, 2008 WL 2073979, at *5 (E.D. Cal. May 14, 2008) (no predominance in wage-and-hour case where plaintiff did not submit sufficient evidence of common, class-wide policy or systemic violations); *Pryor v. Aerotek Sci., LLC*, 278 F.R.D. 516, 536 (C.D. Cal. 2011) (predominance not established where "there is no reliable way to determine if an employee was paid for fewer hours than actually worked without examining each employee's individual time records and considering the employee's individual testimony" because there was no common proof reliably establishing such); *In re Autozone*, 2016 WL 4208200, at *12 (decertifying rest breaks class on predominance grounds because defendant "did not have a uniform written policy in place throughout the class period and because the evidence of employee rest break practices does not reflect a consistent rest break practice"); *Stiller v. Costco Wholesale Corp.*, 298 F.R.D. 611, 628 (S.D. Cal. 2014) (decertifying off-the-clock work claim where there was "no classwide method, of determining whether, how often, and for how long class members actually experienced unpaid [off-the-clock] time").

Whether the damages and liability phases would be bifurcated and, if so, whether damages would then be calculated on an aggregate or individualized basis will depend in part on the statistical models developed by the parties and how the record develops through discovery.  The Court will consider whether class-wide damages may be calculated on an aggregate basis or whether they should be handled through individualized hearings once such models have been developed and the record clarified.  At this time, however, the Court concludes that either method would be manageable.[24]

Accordingly, a class action would be superior to requiring individual litigation, and is also manageable.

## IV.    CONCLUSION

For the reasons above, the Court **GRANTS** Plaintiff's motion for class certification and for appointment of class counsel.  In accordance with this order, the Court hereby certifies the

---

[24] Whether aggregate calculations are permissible would depend on a few factors.  For example, the damages model would have to be tied to Plaintiff's theory of class-wide liability.  *See Comcast Corp. v. Behrand*, 569 U.S. 27, 35 (2013) (damages model must be tied to theory of liability certified for class treatment).  If representative or statistical evidence is used to compute aggregate damages, then it must be reliable and the inferences to be drawn must be just and reasonable in light of the facts of this case.  *See Tyson Foods v. Bouphakeo*, 136 S.Ct. 1036 (2016) (representative evidence must be reliable in relation to elements of cause of action).  In other words, aggregate damages may be permitted if Defendant has an adequate opportunity to litigate its affirmative defenses by attacking the reliability or representativeness of the statistical model, rather than through cross-examining individual claimants.  *See Vaquero v. Ashley Furniture Industries, Inc.*, 824 F.3d 1150 (9th Cir. 2016) (affirming use of representative evidence to calculate aggregate damages of non-testifying absent class members); *see also Monroe v. FTS USA, LLC*, 860 F.3d 389, 411-12 (6th Cir. 2017) (in overtime underreporting case, use of "estimated average" based on a representative sample to compute uncompensated overtime worked was permissible means to calculate aggregate damages).  If those conditions for aggregate damages calculations are not met, the Court at that time may instead opt to pursue individualized hearings at the damages stage.  At this stage, however, such concerns are "hypothetical." *Vaquero*, 824 F.3d at 1156.  The Court retains "discretion to shape the proceedings" and could ultimately "choose an option such as the use of individual claim forms or the appointment of a special master, which plainly would allow Defendants to raise any defenses they may have to individual claims."  *Id.*; *see also Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1168 (9th Cir. 2014) (affirming bifurcated process where "statistical analysis [was] capable of leading to a fair determination of [defendant]'s liability" and individualized damages hearings "preserved the rights of [defendant] to present its damages defenses on an individual basis").  This question can be addressed by the parties at a later phase with a more robust factual record.

28

following class:

> All persons who are or have been employed, at any time from May 9, 2012 through the date of the Court's granting of class certification in this matter, by Bank of America, National Association ("Bank of America") in California under the job titles Loan Officer, Senior Loan Officer, Mortgage Loan Officer, Senior Mortgage Loan Officer, and Senior Lending Officer (collectively "Loan Officers" or "Class Members").

To summarize the Court's opinion, the Court certifies the following questions for resolution on a class-wide basis under Rule 23(a) and Rule 23(b)(3) with respect to Plaintiff's Section 2802 and UCL claims:

1. Whether there was a regular practice of not reimbursing Loan Officers for mileage incurred and reimbursable under § 2802;

2. Whether Defendant had constructive notice of unreimbursed mileage incurred by Loan Officers in the discharge of their duties;

3. Whether Defendant's constructive notice gave rise to a duty of due diligence under Section 2802;

4. Whether Defendant's system-wide efforts (or lack thereof) satisfied its duty of due diligence under Section 2802; and,

5. Whether, in light of questions 1-4, Defendant violated California Labor Code Section 2802 and the UCL.

Finally, the Court appoints Plaintiff Gina McLeod to represent the Class and Leonard Carder, LLP as Class Counsel pursuant to Fed. R. Civ. P. 23(g).

This order disposes of Docket No. 29. The parties shall appear at a Case Management Conference on **January 18, 2018 at 10:30am.** A joint case management statement must be filed 7 days before the hearing in accordance with the local rules.

This order disposes of Docket No. 29.

**IT IS SO ORDERED**.

Dated: December 13, 2017

_____
EDWARD M. CHEN
United States District Judge