United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GINA MCLEOD,<br>　　　　Plaintiff,<br>　　v.<br>BANK OF AMERICA, N.A.,<br>　　　　Defendant. | Case No. 16-cv-03294-EMC<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**<br><br>Docket No. 62 |

Plaintiff Gina McLeod, a mortgage loan officer for Defendant Bank of America ("the Bank"), brought this suit on behalf of a class of Bank of America mortgage loan officers, alleging that the Bank failed to reimburse them for work-related travel in their personal vehicles in violation of California law. This Court granted class certification in December 2017. The parties have now reached a proposed class action settlement; pending before the Court is Plaintiff's motion for preliminary approval of the settlement. *See* Docket No. 62 ("Mot.").

On October 23, 2018, the Court held a hearing on Plaintiff's motion, during which it questioned the parties about the terms of the proposed Settlement Agreement and ordered them to make certain modifications to the Settlement Agreement and Notice. *See* Docket No. 70. The parties made the modifications. *See* Docket Nos. 69, 71. For the reasons stated at the hearing and as set forth below, the Court **GRANTS** Plaintiffs' motion for preliminary approval.

## I.　BACKGROUND

A.　Factual and Procedural Background

Plaintiff McLeod worked as a mortgage loan officer for Bank of America from February 2014 to November 2016. Docket No. 39 ("Class Cert. Order") at 1. She alleges the Bank failed to reimburse her and other loan officers for the use of their personal vehicles for work duties in

violation of California Labor Code § 2802 and a derivative claim under the California Unfair Competition Law ("UCL"), Business & Professions Code § 17200 *et seq*. *Id.* Plaintiff also amended the complaint in July 2016 to add a cause of action under the California Labor Code Private Attorney General Act ("PAGA"), California Labor Code § 2698 *et seq*. *See* Docket No. 13. Plaintiff acknowledges that the Bank has a facially-valid written reimbursement policy, but argues that the Bank failed to exercise due diligence to reimburse Class Members despite having constructive knowledge they incurred mileage expenses. Class Cert. Order at 1. Alternatively, Plaintiff argues that the Bank had a *de facto* policy or practice of not reimbursing loan officers for routine mileage. *Id.*

On December 13, 2017, the Court certified the following class:

> All persons who are or have been employed, at any time from May 9, 2012 through the date of the Court's granting of class certification in this matter, by Bank of America, National Association ("Bank of America") in California under the job titles Loan Officer, Senior Loan Officer, Mortgage Loan Officer, Senior Mortgage Loan Officer, and Senior Lending Officer (collectively "Loan Officers" or "Class Members").

*Id.* at 28–29. The Court also certified the following questions for resolution on a class-wide basis under Rule 23(a) and Rule 23(b)(3) with respect to Plaintiff's § 2802 and UCL claims:

1. Whether there was a regular practice of not reimbursing Loan Officers for mileage incurred and reimbursable under § 2802;
2. Whether Defendant had constructive notice of unreimbursed mileage incurred by Loan Officers in the discharge of their duties;
3. Whether Defendant's constructive notice gave rise to a duty of due diligence under Section 2802;
4. Whether Defendant's system-wide efforts (or lack thereof) satisfied its duty of due diligence under Section 2802; and,
5. Whether, in light of questions 1-4, Defendant violated California Labor Code Section 2802 and the UCL.

*Id.* at 29.

The Bank sought permission to appeal the Class Certification Order, but permission was

denied by the Ninth Circuit. *See* Docket Nos. 42, 48. The parties engaged in settlement negotiations overseen by Magistrate Judge Laporte and on August 16, 2018 advised the Court that they were finalizing the terms of a Settlement Agreement. *See* Docket No. 57. On October 9, 2018, Plaintiff submitted the proposed Settlement Agreement for preliminary approval. *See* Mot.; Docket No. 67-1 ("Sett. Agmt.").

B. Proposed Settlement Terms

1. Definition of Settling Class

The proposed settlement defines the "Settling Class" as comprised of

> All persons who are or have been employed, at any time from May 9, 2012 through the date of Preliminary Approval, by BofA in California under the job titles Mortgage Loan Officer (job code SM009), Senior Mortgage Loan Officer (job code SM172), Senior Lending Officer (job code SM172), FC Lending Officer (job code SM611), Senior FC Lending Officer - E (job code SM610), and/or Senior FC Lending Officer - NE (job code SM614).

Sett. Agmt. ¶ 11. According to the parties, "[t]his definition amends the class definition previously approved by the Court by: (1) specifying the covered positions to include job code numbers; and, (2) extending the class period to cover the weeks since the Court certified the class." Mot. at 5. The parties also explained at the hearing that this definition uses different job titles than the previous definition because the Bank has changed its designations for mortgage loan officers, but that the two definitions are co-extensive in terms of the loan officer positions covered.

2. Monetary Relief

The proposed settlement creates a non-reversionary $11 million gross settlement fund. Sett. Agmt. ¶¶ 8, 10. The gross settlement fund will be allocated in the following order:

(i) Attorneys' fees of $3.3 million, or 30% of the settlement fund, to class counsel and reimbursement of class counsel's out-of-pocket litigation expenses not to exceed $75,000. Mot. at 6; Sett. Agmt. ¶ 38.

(ii) A representative service award of $15,000 for Named Plaintiff McLeod. Mot. at 6; Sett. Agmt. ¶ 39.

(iii) $37,500 in penalties to the California Labor Workforces Development Agency to

3

settle the PAGA claim. Mot. at 6; Sett. Agmt. ¶ 43. The $37,500 penalty represents 75% of the $50,000 allocated in the gross settlement fund to settle the PAGA claim; the remaining 25% will be distributed to Class Members. *See* Cal. Lab. Code § 2699(i) ("[C]ivil penalties recovered by aggrieved employees shall be distributed as follows: 75 percent to the Labor and Workforce Development Agency . . . and 25 percent to the aggrieved employees").

(iv) Fees and costs of the Claims Administrator, capped at $20,300. Mot. at 6; Sett. Agmt. ¶ 43.

(v) The approximately $7,552,200 remaining after the above items are deducted will be distributed to Class Members as the net settlement fund. Mot. at 6; Sett. Agmt. ¶ 43.

(vi) The residual amount of the settlement fund from any settlement checks not cashed by Class Members will be "paid to the State of California as unclaimed wages under the name of the Settling Class Member pursuant to the escheat procedures set forth in the California Code of Civil Procedure section 1300, *et seq.*" Sett. Agmt. ¶ 43.

The net settlement fund will be distributed to Class Members pro rata based on the number of weeks they worked for the Bank as a loan officer in California during the settlement period. Mot. at 4. The parties estimate that each Class Member will receive approximately $40 per workweek, which represents approximately 73 miles driven per workweek. *Id.* at 4. Plaintiff, based on a small survey of current and former loan officers, estimates that loan officers logged an average of 170 unreimbursed work-travel miles per week (a number the Bank disputes). *See* Mot. at 10. Thus, the reimbursement for 73 miles per workweek represents a 43% recovery for the 170 total unreimbursed miles. *See id.*

3. Non-Monetary Relief

Under the Settlement Agreement, the Bank will submit to a five-year consent decree that requires it to:

(i) Send monthly email reminders to individuals in the covered loan officer positions,

4

    and to individuals directly managing them, that work travel expenses are
    reimbursable;

  (ii) Provide training to newly hired individuals in the covered positions and refresher
    training to supervisors of loan officers on reimbursements for work-related travel;
    and

  (iii)Train covered loan officers and their supervisors on how to access Defendant's
    reimbursement software on a smartphone.

Sett. Agmt. ¶ 56. The parties estimate that "[c]urrent class members who continue to work as MLOs during the consent decree period would receive approximately $93 a week in mileage reimbursement, assuming the current IRS mileage reimbursement rate and the 170 miles incurred per week." Mot. at 10–11.

  4.  Claims Process

  The settlement fund will be disbursed automatically to Class Members who do not opt out. Per the proposed settlement process, the Claims Administrator will mail a Settlement Notice to each Class Member together with a separate Adjustment Form. Sett. Agmt. ¶ 46; Docket No. 71-1 (Notice); Docket No. 69-3 (Adjustment Form). The Adjustment Form will provide an individualized estimate of the settlement payment to the recipient Class Member based on the number of weeks she worked. Sett. Agmt. ¶ 46. Upon receiving the notice, a Class Member can do nothing, return an opt-out request, or submit an Adjustment Form with supporting documentation if she believes the estimated settlement payment calculated by the Claims Administrator is incorrect. *Id.* ¶¶ 46–48. Any Class Member who does not respond to the settlement notice will receive her settlement check without needing to take any further action; any Class Member who submits a corrected Adjustment Form will likewise receive her settlement check once the adjustment challenge is resolved by the Claims Administrator. *Id.* ¶¶ 49–52.

## II.  **DISCUSSION**

A. Legal Standard

  A class action may only be settled with court approval. Fed. R. Civ. P. 23(e). Where the proposal will bind class members (by, *e.g.*, releasing their claims), the court must find that it is

"fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). This standard balances the public policy favoring settlement of complex class action litigation, *see In re Syncor ERISA Litig.*, 516 F.3d 1095, 1101 (9th Cir. 2008), with the due process interests of absent class members, *Hanlon v. Chrysler Corp.*, 150 F.3d 1101, 1026 (9th Cir. 1998). The Court "has a fiduciary duty to look after the interests of those absent class members." *Allen v. Bedolla*, 787 F.3d 1218, 1223 (9th Cir. 2015).

The Court may grant preliminary approval of a settlement and direct notice to the class if the settlement: (1) appears to be the product of serious, informed, non-collusive negotiations; (2) has no obvious deficiencies; (3) does not improperly grant preferential treatment to class representatives or segments of the class; and (4) falls within the range of possible approval. *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079–80 (N.D. Cal. 2007) (citation omitted).[1]

B.   Whether Proposed Settlement Falls Within Range of Possible Approval

The Court first considers whether the settlement agreement falls within the range of possible approval. "To evaluate the range of possible approval criterion, which focuses on substantive fairness and adequacy, courts primarily consider plaintiffs' expected recovery balanced against the value of the settlement offer." *Vasquez v. Coast Valley Roofing, Inc.,* 670 F. Supp. 2d 1114, 1125 (E.D. Cal. 2009) (citing *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1080 (N.D. Cal. 2007) (internal quotations omitted). Additionally, the Court may preview the factors that ultimately inform final approval: (1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the benefits offered in the settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement. *See Churchill Village, L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004) (citing *Hanlon*, 150 F.3d at 1026).

---

[1] Because the class in this case has already been certified, the Settlement Agreement need not be held to the "higher standard of fairness" required of pre-certification settlements. *See Hanlon*, 150 F.3d at 1026.

6

The parties estimate that the maximum possible recovery from Plaintiff's § 2802 claim is approximately $17.5 million. Docket No. 62-1 ¶ 24. This figure was calculated by multiplying Plaintiff's estimate of the 170 reimbursable miles traveled per week by a loan officer by the 54.5 cents per mile IRS reimbursement rate and then by the 188,820 total weeks worked by Class Members during the settlement period. *Id.* The parties further estimate that the maximum value of Plaintiff's PAGA claim is approximately $4.7 million. *Id.* Thus, the overall maximum value of Plaintiff's claims is approximately $22.2 million, and the monetary value of the proposed settlement is 49.55% of the maximum potential recovery at trial. This puts the proposed settlement within the range of possible approval. *See, e.g.*, *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000) (finding a settlement amount of one-sixth of the potential recovery to be fair and adequate under the circumstances); *Roe v. Frito-Lay, Inc.*, No. 14-CV-00751-HSG, 2016 WL 4154850, at *7 (N.D. Cal. Aug. 5, 2016) (finding a settlement amount on a claim constituting 32.4% of defendant's potential statutory damage exposure to be reasonable); *Greko v. Diesel U.S.A., Inc.*, No. 10–cv–02576 NC, 2013 WL 1789602, at *5 (N.D. Cal. Apr. 26, 2013) (finding settlement amount of 24% reasonable). The adequacy of the proposed settlement amount is reinforced by the prospective value of the parties' consent decree, which is projected to provide $15 million in mileage reimbursements to loan officers over the course of five years. *See* Docket No. 62-1 ¶ 25.

Moreover, considerations relating to the strength of Plaintiff's case as well as the risk, expense, complexity, and likely duration of further litigation weigh in favor of the proposed monetary settlement. *See Viceral v. Mistras Grp., Inc.*, No. 15-CV-02198-EMC, 2016 WL 5907869, at *7 (N.D. Cal. Oct. 11, 2016) (explaining that the "value of a settlement cannot be assessed in a vacuum," but rather "must be considered in light of the strength of the plaintiff's case and the risks in pursuing further litigation"). Class counsel identify two particular risks in proceeding with this litigation. First, they acknowledge that they may not be able to establish to the satisfaction of a jury that the Bank failed to exercise due diligence in ensuring that loan officers were reimbursed for their work-related travel. Mot. at 8. As the Court observed in certifying the class, "[t]o prevail under Section 2802, a plaintiff must show that the employer

7

'knew or had reason to know the expense was incurred.' Such actual or constructive knowledge, in turn, requires the employer to 'exercise due diligence to ensure that each employee is reimbursed.'" Class Cert. Order at 12 (quoting *Stuart v. RadioShack Corp.*, 641 F. Supp. 2d 901, 903 (N.D. Cal. 2009)). Here, Defendant contends that it maintains a written reimbursement policy that "informs all employees, including MLOs, that work-related travel is reimbursable"; "utilizes CONCUR, an expense reimbursement program that allows MLOs to submit their work-related travel as a business expense"; and "provides all new employees with the expense policy upon hiring." Mot. at 8. Thus, there is a risk that a jury could agree with Defendant's actions constituted due diligence. *Id.*

Second, Plaintiff concedes that there is a "lack of records of work-related mileage." *Id.* The Bank did not maintain contemporaneous mileage records, and "the parties have been unable so far to reconstruct the amount of miles from the records that do exist." *Id.* at 8–9. During class certification briefing, Dr. Dwight Steward, the economist and statistician retained by Plaintiff, proposed a survey methodology for calculating unreimbursed mileage in order to establish class-wide liability and estimate damages:

> With respect to liability, he proposes surveying a statistically representative sample of class members about the existence of unreimbursed mileage they may have incurred based on a random sampling methodology that would account for any possibly potent variations, such as work location. With respect to damages, he proposes a similar sampling approach that would involve surveying individuals about typical travel mileage combined with observational approaches like measuring distances with GPS applications or other means. The specific approach, however, cannot be designed until the full universe of available information is understood and investigated.

Class Cert. Order at 6. For the purposes of the instant motion, Plaintiff arrived at an estimate of 170 unreimbursed miles per loan officer per week after surveying 33 current or former loan officers. *See* Mot. at 10. These methods of approximating unreimbursed mileage are not ironclad. For instance, "conducting a scientifically designed and administered survey does not automatically make such evidence admissible." Mot. at 9 (citing *Duran v. U.S. Bank Nat'l Assn.*, 19 Cal. App. 5th 630, 650 (2018) (holding that trial court did not abuse its discretion in rejecting a survey submitted in support of class certification due to discrepancies in survey results and possibility

8

1   that results were tainted by bias), *as modified on denial of reh'g* (Feb. 9, 2018)). Additionally, the
2   Bank disputes the 170 miles per week figure, arguing that many loan officers "drive little or no
3   miles in a typical workweek." Mot. at 10.

Given the relatively high value of the proposed settlement as a percentage of the maximum potential recovery, the future benefits anticipated from the consent decree, and Plaintiff's concerns about the strength of her claims, the Court finds that the proposed settlement falls within the range of possible approval.

C.  Settlement Process

"An initial presumption of fairness is usually involved if the settlement is recommended by class counsel after arm's-length bargaining." *Riker v. Gibbons*, 2010 WL 4366012, at *2 (D. Nev. Oct. 28, 2010) (citing 4 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 11:42 (4th ed. 2002)). Here, the parties arrived at the settlement after engaging in mediation, a moderate amount of discovery, and finally settlement negotiations overseen by Magistrate Judge Laporte. *See* Docket No. 62-1 ¶¶ 11–14. Thus, the settlement agreement is the product of arm's-length bargaining. Further, due to the expense reimbursement data provided by the Bank in discovery, Plaintiff and class counsel had adequate information before them to gauge the value of the class claims and assess the adequacy of the settlement terms. *See Hanlon,* 150 F.3d at 1027 (affirming approval of settlement after finding "no evidence to suggest that the settlement was negotiated in haste or in the absence of information illuminating the value of plaintiffs' claims"). Accordingly, there is no indication of any procedural deficiencies in the settlement process.

D.  Presence of Obvious Deficiencies

During the hearing, the Court questioned counsel for both parties about the terms of the Settlement Agreement and counsel's explanations clarified many aspects of the settlement. The Court also raised several (relatively minor) concerns about the terms of the proposed agreement, and suggested modifications to address those concerns. The parties have made the responsive changes, and no obvious deficiencies remain. The Court briefly discusses some important terms of the Settlement Agreement below and explains its rationale for finding the terms satisfactory.

### 1. Class Notice

The parties propose that the Settlement Notice will be sent via first-class mail to the last-known addresses of Class Members. Mot. at 12. Any mail returned with a forwarding address will be re-mailed to the forwarding address. *Id.* Any mail returned without a forwarding address will be re-mailed after an updated address is obtained via skip-tracing. *Id.* This method of notice satisfies due process. *See Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 254 (N.D. Cal. 2015) (approving system of mailing settlement notices to last-known addresses and using skip traces to re-mail undeliverable mail as "reasonably calculated to provide notice to class members"). Additionally, the Claims Administrator will establish a website and toll-free telephone number to provide Class Members with information about the settlement. Mot. at 12.

As for the content of the Settlement Notice, a class action settlement notice "is satisfactory if it generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard." *Churchill Village*, 361 F.3d at 575. More specifically, notice to a class certified under Rule 23(b)(3) "must clearly and concisely state in plain, easily understood language (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3)." Fed. R. Civ. P. 23(c)(2)(B).

The Settlement Notice here satisfies the requirements of Rule 23(c)(2)(B). In response to the Court's comments at the hearing, the parties made modifications to the Settlement Notice to clarify the description of the nature of the action, the estimate for each Class Member's expected recovery, the implications of objecting to the settlement, and the process for opting out of the settlement. *See* Docket No. 71-1.

### 2. Claims Process

There are no issues with the proposed payment procedure, since Class Members do not need to go through a claims process. Class Members will automatically receive their settlement

checks without needing to respond to the settlement notice. *See* Sett. Agmt. ¶¶ 46–52. The only action a Class Member may need to take is to submit the Adjustment Form in the event that they believe the individualized settlement payment estimate provided to them by the Claims Administrator is incorrect. *See id.* ¶ 48. If a Class Member submits an Adjustment Form, the Claims Administrator will examine the purported discrepancy and issue a decision, then disburse the settlement payment. *See id.*

In response to the Court's comments at the hearing, the parties made modifications to the Adjustment Form to clarify the types of documentary evidence Class Members can submit in support of their adjustment claims, and that the Claims Administrator's final and non-appealable resolution of a claim will be accompanied by an explanation. *See* Docket No. 69-3.

### 3. Scope of Release

The settlement agreement contains the following release:

> [T]o the extent permitted by applicable law, the Settling Class hereby releases, discharges, and covenants not to sue Bank of America, N.A. and Bank of America Corporation, including its and their predecessors, successors, affiliates, parents, subsidiaries, related companies, property owners, employees, agents, shareholders, officers, directors, attorneys, insurers, and any entity which could be jointly liable with Bank of America, N.A. and/or Bank of America Corporation or any of them (individually and collectively "the BofA Releasees,") from and with respect to any and all actions, causes of action, suits, liabilities, claims, and demands whatsoever, whether known or unknown, during the Settling Class Period, which the Settling Class, or individual members thereof, has, or had against the BofA Releasees, or any of them, which are based on, or in any way related to any claims that were alleged in the Lawsuit or could have been alleged in the Lawsuit based on the current or prior pleadings therein, including without limitation claims for violation of: Labor Code § 2802; Business & Professions Code §§ 17200 et seq.; The Labor Code Private Attorney General Act of 2004, Labor Code §§ 2698 et seq.; or any other California or local or federal law, ordinance, and/or administrative regulation relating to the reimbursement of business expenses, and any additional claims for penalties, wages, interest or other monies predicated on same (the "Released Claims").

Sett. Agmt. ¶ 53. To facilitate the release of claims covered by ¶ 53 that are currently unknown to class members, the settlement agreement additionally provides that

> all Settling Class Members expressly waive any and all rights or benefits conferred on them by the provisions of Section 1542 of the California Civil Code, which provides as follows: "A GENERAL

11

RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

*Id.* ¶ 55.

The release is appropriately qualified by the language limiting released claims to those "based on, or in any way related to any claims that were alleged in the Lawsuit or could have been alleged in the Lawsuit based on the current or prior pleadings therein." *Id.* ¶ 53.

### 4. Escheatment of Unclaimed Funds

The settlement agreement provides that "the amount of any settlement checks that are not cashed by Settling Class Members as well as any portion of the [gross settlement value] not otherwise allocated under this Settlement shall be . . . paid to the State of California as unclaimed wages under the name of the Settling Class Member pursuant to the escheat procedures set forth in the California Code of Civil Procedure section 1300, *et seq.*" Sett. Agmt. ¶ 43(f). The Ninth Circuit has approved escheatment to the government of any class settlement funds unclaimed after attempted distribution. *See Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1306–07 (9th Cir. 1990); *see also Rodriguez v. Danell Custom Harvesting, LLC*, No. 1:16-CV-01848-SAB, 2018 WL 3390412, at \*6 (E.D. Cal. July 10, 2018) (approving class action settlement of wage and hour claims brought under, *inter alia*, § 2802, pursuant to which "[a]ny unclaimed funds will be sent to the California Division of Labor Standards Enforcement's Unpaid Wages Fund to be held in the name of and for the benefit of the class members under California's escheatment laws").

### 5. Attorneys' Fees

"Where a settlement produces a common fund for the benefit of the entire class, courts have discretion to employ either the lodestar method or the percentage-of-recovery method" in awarding attorneys' fees. *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 942 (9th Cir. 2011) (citation omitted). "Because the benefit to the class is easily quantified in common-fund settlements," courts may "award attorneys a percentage of the common fund in lieu of the often more time-consuming task of calculating the lodestar." *Id.* "Applying this calculation method,

courts typically calculate 25% of the fund as the 'benchmark' for a reasonable fee award." *Id.*

Here, class counsel is asking for an award of $3.3 million in attorneys' fees, which amounts to 30% of the settlement fund, plus expenses not to exceed $75,000. *See* Mot. at 6; Sett. Agmt. ¶ 38. In determining whether an attorneys' fee award is justified, the Court must evaluate the results obtained. *See Vizcaino v. Microsoft Corp.*, 142 F. Supp. 2d 1299, 1304 (W.D. Wash. 2001), *aff'd*, 290 F.3d 1043 (9th Cir. 2002); *see also Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983) (stating that the "most critical factor" to the reasonableness of an attorney fee award is "the degree of success obtained"). There is no question that class counsel have obtained favorable settlement terms in this case because, as discussed above, the proposed monetary settlement amounts to approximately half of the maximum potential recovery at trial, and Class Members still employed by as loan officers by Defendant are anticipated to benefit substantially from the consent decree that is part of the settlement.

On the other hand, the fee represents a higher percentage of the settlement fund than the 25% benchmark in the Ninth Circuit, although not outside of the range that has been awarded in the past. *Compare Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 258 (N.D. Cal. 2015) ("express[ing] doubt that [the requested] 30 percent fee arrangement was appropriate given the typical 25 percent benchmark in the Ninth Circuit" and approving counsel's decision to reduce fee request to 25 percent), *with Paul Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989) (noting that typically, in common fund class settlements, "fees awards range from 20 percent to 30 percent of the fund created"). A fee award of $3.3 million may be excessive given that the litigation in this case has not been particularly extensive. Aside from briefing and arguing class certification, the parties have engaged in one round of mediation, some discovery, and the settlement negotiations that culminated in this proposed agreement. Plaintiff's counsel stated at the hearing that their requested fee represents approximately a four-time multiplier on the lodestar figure for their work on this case. *See Vizcaino*, 142 F. Supp. 2d at 1305 ("District Courts often use the lodestar method as a cross-check on the percentage method in order to ensure a fair and reasonable result.").

The Court will reserve ruling on Plaintiff's attorneys' fees request until the final settlement

13

approval stage, while noting its concerns above.

E.      Preferential Treatment

The settlement agreement proposes to distribute the settlement funds on a pro rata basis to Class Members based on the number of weeks they worked within the settlement period, and does not appear to grant preferential treatment to any Class Members. *See Nen Thio v. Genji, LLC*, 14 F. Supp. 3d 1324, 1334–35 (N.D. Cal. 2014) (finding no undue preferential treatment where settlement payment for minimum wage and overtime compensation claims was allocated pro rata among the claimants based upon the number of hours of overtime worked").

The proposed settlement provides a representative service award of $15,000 to the Named Plaintiff. *See* Mot. at 6. The Ninth Circuit has recognized that service awards to named plaintiffs in a class action are permissible and do not necessarily render a settlement unfair or unreasonable. *See Stanton v. Boeing Co.,* 327 F.3d 938, 977 (9th Cir. 2003). However, the service award must be "reasonable," and the Court "must evaluate their awards individually, using 'relevant factors includ[ing] the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, . . . the amount of time and effort the plaintiff expended in pursuing the litigation . . . and reasonabl[e] fear[s of] workplace retaliation." *Id.* (quoting *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998)) (alterations in original). As the only Named Plaintiff in this action, Ms. McLeod has undoubtedly advanced the interests of the class and benefitted Class Members by securing this settlement agreement, especially given that many Class Members have asserted that they previously were not even "aware their mileage could be expensed under the [Bank]'s written policy." Class Cert. Order at 5–6. However, the Ninth Circuit has cautioned that where there is a "very large differential in the amount of damage awards between the named and unnamed class members," that differential must be justified by the record. *Staton v. Boeing Co.*, 327 F.3d 938, 978 (9th Cir. 2003). Here, a service award of $15,000 would be much greater than the amounts that the other Class Members are likely to recover, and the Named Plaintiff has not asserted that she has expended a particularly significant amount of time and effort in this case, or that she may be subject to workplace retaliation for her role in bringing the litigation. The Court therefore finds that a service award of $7,500 is reasonable.

14

### III. CONCLUSION

For the foregoing reasons, the primary terms of the proposed settlement agreement are fair, reasonable, and adequate given the circumstances of this case. Accordingly, with the exception of the attorneys' fees request, and the adjustment to the Named Plaintiff's service award, the Court **GRANTS** preliminary approval of the proposed settlement.

This Order disposes of Docket No. 62.

**IT IS SO ORDERED**.

Dated: November 14, 2018

EDWARD M. CHEN
United States District Judge