UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GINA MCLEOD,<br><br>    Plaintiff,<br><br>v.<br><br>BANK OF AMERICA, N.A.,<br><br>    Defendant. | Case No. 16-cv-03294-EMC<br><br>**ORDER GRANTING MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT, MOTION FOR APPROVAL OF CONSENT DECREE, AND MOTION FOR ATTORNEYS' FEES**<br><br>Docket Nos. 73-75 |

Plaintiff Gina McLeod, a mortgage loan officer ("MLO") for Defendant Bank of America ("the Bank"), brought this suit on behalf of a class of Bank of America mortgage loan officers, alleging that the Bank failed to reimburse them for work-related travel in their personal vehicles in violation of California law. This Court certified the class in December 2017. The parties then reached a settlement, and the Court granted preliminary approval to the proposed Settlement Agreement on November 14, 2018. *See* Docket No. 72.

Currently pending before the Court is the parties' motion for final approval of the Settlement Agreement, Docket No. 74 ("Final Approval Mot."), the Bank's motion for approval of the Consent Decree that constitutes the injunctive portion of the Settlement Agreement, Docket No. 75 ("Consent Decree Mot."), and Plaintiff's motion for attorneys' fees and an incentive award, Docket No. 73 ("Fee Mot."). No Class Member has requested to opt out of the settlement class or object to the Settlement Agreement. *See* Docket No. 77 ¶¶ 8, 9. For the reasons discussed below, the Court:

    (1) **GRANTS** final approval of the Settlement Agreement;

    (2) **GRANTS** approval of the Consent Decree;

(3) **GRANTS** approval of Class Counsel's fee motion in the amount of $3 million, and of Ms. McLeod's request for an incentive award of $15,000.

## I. BACKGROUND

A. The Settlement Agreement

The settlement class consists of:

> All persons who are or have been employed, at any time from May 9, 2012 through the date of Preliminary Approval, by BofA in California under the job titles Mortgage Loan Officer (job code SM009), Senior Mortgage Loan Officer (job code SM172), Senior Lending Officer (job code SM172), FC Lending Officer (job code SM611), Senior FC Lending Officer - E (job code SM610), and/or Senior FC Lending Officer - NE (job code SM614).

Docket No. 67-1 ("Sett. Agmt.") ¶ 11. There are 2,403 individuals in the settlement class. Docket No. 74-1 ("Patton Decl.") ¶ 6.

The Settlement Agreement provides both monetary and injunctive relief to Class Members. The monetary relief is a non-reversionary $11 million gross settlement fund. Sett. Agmt. ¶¶ 8, 10. Attorneys' fees and costs, an incentive award for Ms. McLeod (the only Named Plaintiff), a penalty to the California Labor Workforces Development Agency, and the Settlement Administrators' fees and costs will be deducted from the gross settlement fund before funds are distributed to Class Members. *Id.* ¶¶ 38, 39, 43. The remaining funds will be distributed to Class Members pro rata based on the number of weeks they worked for the Bank as an MLO in California during the settlement period. The disbursements will be made automatically to Class Members; they do not need to submit claims. If the proposed amounts of Class Counsel's fees and Ms. McLeod's incentive award are approved, the net settlement fund for Class Members will be $7,552,200. Patton Decl. ¶ 12. Each Class Member will receive $41.17 per workweek, which translates to compensation for 76 miles per workweek at the current IRS mileage rate of 54.5 cents per mile. *Id.* The average award will be $3,142.82. *Id.* Plaintiff, based on a small survey of MLOs, estimates that each MLO logged an average of 170 unreimbursed work-travel miles per week (a number the Bank disputes). Docket No. 62 at 10. Thus, the reimbursement for 76 miles per workweek represents a 45% recovery.

For the injunctive portion of the Settlement Agreement, the Bank will submit to a five-year

1  Consent Decree that requires it to:

2      (i) Send monthly email reminders to individuals in the covered MLO positions, and to

3          individuals directly managing them, that work travel expenses are reimbursable;

4      (ii) Provide training to newly hired individuals in the covered positions and refresher

5          training to supervisors of MLOs on reimbursements for work-related travel; and

6      (iii) Train covered MLOs and their supervisors on how to access the Bank's reimbursement

7          software on a smartphone.

Sett. Agmt. ¶ 56. The parties estimate that current Class Members who continue to work as MLOs during the five-year period will receive approximately $93 a week in mileage reimbursements, assuming each MLO drives an average of 170 miles per week—generating approximately $15 million in value to the settlement class. Final Approval Mot. at 13. In return, Class Members will agree that the Bank's "compliance with [the Consent Decree] will constitute a complete defense against Labor Code § 2802 claims by individuals in Covered Positions for work travel-related reimbursement during the Covered Period, to the extent those claims involve allegations that BofA takes insufficient affirmative steps to socialize or promulgate its Global Expense Standard or otherwise fails to take sufficient action to encourage or compel individuals in Covered Positions to submit for expense reimbursement." Sett. Agmt. ¶ 59.

B.    <u>Updates Since Preliminary Approval</u>

On December 20, 2018, the Settlement Administrator mailed notice of the settlement to all 2,403 Class Members. Patton Decl. ¶ 6. 151 notice packets were returned as undeliverable. *Id.* ¶ 7. The Settlement Administrator was able to locate new addresses for 145 of these, and re-mail the notice. Docket No. 77 ¶ 7. The Settlement Administrator also set up a website for Class Members read the notice, get answers to frequently asked questions, review and download case documents, submit a change of address form, and get contact information for Class Counsel. *Id.* ¶ 4. Class Counsel's motion for attorneys' fees and Ms. McLeod's request for an incentive award were posted on the website after they were filed with the Court on December 26, 2018. Finally, the Settlement Administrator set up a toll-free number for telephone support, through which it has fielded calls from 89 Class Members. *Id.* ¶ 5. The deadline for Class Members to exclude

3

themselves from the settlement class, and to file objections to the Settlement Agreement, was February 18, 2019. No Class Member has opted out or objected. *Id.* ¶¶ 8, 9.

## II. DISCUSSION

A. Final Approval

A class action may only be settled with court approval. Fed. R. Civ. P. 23(e). Where, as here, the proposed settlement will bind class members (by, *e.g.*, releasing their claims), the court must find that it is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). This standard balances the public policy favoring settlement of complex class action litigation, *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1101 (9th Cir. 2008), with the due process interests of absent class members, *Hanlon v. Chrysler Corp.*, 150 F.3d 1101, 1026 (9th Cir. 1998).

In making its fairness assessment, courts typically consider: (1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members of the proposed settlement. *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 943 (9th Cir. 2011) (citation omitted).[1]

In its Order granting preliminary approval, this Court provided an assessment of the first five factors. *See* Docket No. 72 at 6–14. To summarize briefly, the amount offered in the Settlement Agreement is favorable to Class Members. The monetary value of the proposed settlement ($11 million) is 49.55% of the maximum recovery Class Members could potentially obtain at trial ($22.2 million). *Id.* at 7. The prospective benefits that the Consent Decree will provide—a projected $15 million in mileage reimbursements to MLOs over the course of five years—further bolsters the value of the settlement. *See id.* The settlement allows Class Members to avoid two particular risks in taking this case to trial. The first is that they will not be able to

---

[1] Because the class in this case has already been certified, the Settlement Agreement need not be held to the "higher standard of fairness" required of pre-certification settlements. *See Hanlon*, 150 F.3d at 1026.

4

establish that the Bank failed to exercise due diligence in ensuring that MLOs were reimbursed for their travel, because the Bank maintains a robust written reimbursement policy. *Id.* at 8. The second risk is that there is a "lack of records of work-related mileage," which has forced Class Members to estimate their damages using a survey methodology instead of relying on contemporaneous records. *Id.* Either or both of these deficiencies in Plaintiff's case could jeopardize any prospect of recovery at trial. These factors support approval.

The remaining *Bluetooth* factors that are pertinent for final approval are "the experience and views of counsel" and "the reaction of the class members of the proposed settlement." *Bluetooth Headset*, 654 F.3d at 943. Class Counsel's declarations indicate that they are experienced litigators in wage and hour class actions. *See* Docket Nos. 73-1, 73-2.

More significant is the absence of any objections from the 2,403 Class Members to the Settlement Agreement, and the absence of any opt-out requests. "A low number of opt-outs and objections in comparison to class size is typically a factor that supports settlement approval." *In re Linkedin User Privacy Litig.*, 309 F.R.D. 573, 589 (N.D. Cal. 2015) (citing *Hanlon*, 150 F.3d at 1027). Here, no one has opted out or objected, "indicat[ing] overwhelming support among the class members." *Harper*, 2017 WL 995215, at *5. This factor thus weighs strongly in favor of approval.

In sum, the *Bluetooth* factors indicate that the Settlement Agreement is fair, reasonable, and adequate, and the motion for final approval is **GRANTED**.

B.  Consent Decree

The Bank asks the Court to approve and enter the proposed Consent Decree set forth in paragraphs 56 to 62 of the Settlement Agreement. Plaintiff does not oppose the request. *See* Docket No. 76. "A consent decree is essentially a settlement agreement subject to continued judicial policing." *United States v. State of Oregon*, 913 F.2d 576, 580 (9th Cir. 1990) (citation and internal quotation marks omitted). It "must conform to applicable laws," although it "need not impose all the obligations authorized by law." *Id.* Approval of a proposed consent decree is within the district court's discretion. *United States v. Pac. Gas & Elec.*, 776 F. Supp. 2d 1007, 1024 (N.D. Cal. 2011). "Before approving a consent decree, a district court must be satisfied that

it is at least fundamentally fair, adequate and reasonable." *Oregon*, 913 F.2d at 580. This requires the court to "evaluate both the procedural and substantive fairness of the consent decree." *Pac. Gas*, 776 F. Supp. 2d at 1024.

### 1. Procedural Fairness

"With regard to procedural fairness, courts determine whether the negotiation process was fair and full of adversarial vigor." *Pac. Gas*, 776 F. Supp. 2d at 1025 (citations and internal quotation marks omitted). A decree that is the product of "good faith, arms-length negotiations" is "presumptively valid." *Oregon*, 913 F.2d at 581. This Consent Decree was negotiated as part of the overall Settlement Agreement, which the Court has already found was the product of good faith, arms-length negotiations. *See* Docket No. 72 at 9. The Consent Decree is therefore procedurally fair.

### 2. Substantive Fairness

With respect to substantive fairness, the court does not determine whether "the settlement is one which the court itself might have fashioned, or considers ideal." *Pac. Gas*, 776 F. Supp. 2d at 1025 (quoting *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 84 (1st Cir. 1990)). Instead, the "court need only be satisfied that the decree represents a 'reasonable factual and legal determination.'" *Oregon*, 913 F.2d at 581 (quoting *United States v. City of Miami, Fla.*, 664 F.2d 435, 441 (5th Cir. 1981)).

The Consent Decree projects to confer substantial benefits upon Class Members who will continue to work as MLOs. Based on Plaintiff's estimates for the number of work-related miles driven by MLOs, each Class Member stands to receive an average of $93 a week in mileage reimbursements, a non-trivial sum. *See* Final Approval Mot. at 13. This suggests that with the training and monthly reminders mandated by the Consent Decree, Class Members will be incentivized to submit reimbursement requests. If Plaintiff's mileage estimates are correct, Class Members collectively stand to receive approximately $15 million in total reimbursements during the five years the Consent Decree is in effect. *See id.* Thus, the Consent Decree furthers the public policy motivating Labor Code § 2802, which is to "to prevent employers from passing their operating expenses on to their employees," including specifically to ensure employers "reimburse

6

United States District Court
Northern District of California

the employee for the cost of [work-related] travel." *Gattuso v. Harte-Hanks Shoppers, Inc.*, 42 Cal. 4th 554, 562 (2007) (quoting Sen. Rules Com., Off. of Sen. Floor Analyses, analysis of Sen. Bill No. 1305 (1999–2000 Reg. Sess.) as amended Aug. 18, 2000); *see Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*, 478 U.S. 501, 525 (1986) (holding that a consent decree "must further the objectives of the law upon which the complaint was based").

The question is whether it is fair for Class Members, in exchange for these benefits, to release the Bank from liability for any claims alleging that the Bank "takes insufficient affirmative steps to socialize or promulgate its Global Expense Standard or otherwise fails to take sufficient action to encourage or compel [MLOs] to submit for expense reimbursement" work-related mileage. Sett. Agmt. ¶ 59 (providing that the Bank's "compliance with [the Consent Decree] will constitute a complete defense" against such claims). The Bank explains that the certainty provided by this release is "critical" given that "no court has yet explained what it means to take 'reasonable steps' [under Labor Code § 2802] to ensure reimbursement of expenses reasonably and necessarily incurred by employees." Consent Decree Mot. at 8.

The Bank's concerns are not baseless. Section 2802 requires employers to indemnify employees for all "necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties." Cal. Lab. Code § 2802(a). The California Supreme Court has clarified that "under § 2802, ascertaining what was a necessary expenditure will require an inquiry into what was reasonable under the circumstances." *Gattuso*, 42 Cal. 4th at 568. However, there is a lack of appellate guidance on the circumstances that trigger an employer's reimbursement obligations under § 2802, leading to inconsistencies in the standards applied by lower courts. *See Stuart v. RadioShack Corp.*, 641 F. Supp. 2d 901, 902 (N.D. Cal. 2009) ("Section 2802 simply states that an employer *shall* reimburse; it says nothing about *when* the duty to reimburse is triggered.") (emphases in original). Some courts have held that "whether the employee actually sought reimbursement from [the employer]" is relevant to determining the employer's duty. *Chavez v. Lumber Liquidators, Inc.*, No. CV-09-4812 SC, 2012 WL 1004850, at *10 (N.D. Cal. Mar. 26, 2012). In contrast, this Court has ruled that § 2802 "focuses not on whether an employee makes a request for reimbursement but rather on whether the employer

7

either knows or has reason to know that the employee has incurred a reimbursable expense." *Stuart*, 641 F. Supp. 2d at 903. "If [the employer] does, it must exercise due diligence to ensure that each employee is reimbursed." *Id.*; *see* Docket No. 39 at 12 (certifying class in this case under the same standard).

Several other courts have adopted the latter standard for determining when an employer's duty to reimburse is triggered under § 2802. *See, e.g.*, *Tokoshima v. Pep BoysManny Moe & Jack of California*, No. C-12-4810-CRB, 2014 WL 1677979, at *8 (N.D. Cal. Apr. 28, 2014); *Green v. Lawrence Serv. Co.*, No. LA CV12-06155 JAK, 2013 WL 3907506, at *10 (C.D. Cal. July 23, 2013). But even assuming the *Stuart* standard governs, there is a paucity of case law explicating what constitutes "due diligence and . . . reasonable steps" for the employer under § 2802. *Stuart*, 641 F. Supp. 2d at 904. As a result, the Bank may comply with the Consent Decree and offer regular reimbursement trainings and reminders to both MLOs and their supervisors and *still* face claims that it is not exercising due diligence.

In light of these uncertainties, the Court concludes that the robust steps the Bank will take to facilitate higher rates of mileage reimbursement under the Consent Decree in exchange for Class Members releasing certain § 2802 claims represent a reasonable compromise. *See Oregon*, 913 F.2d at 580–81 (remarking that "[a consent decree] is not a decision on the merits or the achievement of the optimal outcome for all parties, but is the product of negotiation and compromise"). As the parties put it, the Consent Decree "addresses Plaintiff's concern that the Bank's efforts to encourage reimbursement prior to this litigation were not sufficient, and addresses the Bank's concern that, absent certainty of its legal obligations, it will face repeated litigation on mileage reimbursement for Loan Officers." Consent Decree Mot. at 9. Moreover, the scope of the release is limited to "claims involv[ing] allegations that BofA takes insufficient affirmative steps to socialize or promulgate its Global Expense Standard or otherwise fails to take sufficient action to encourage or compel individuals in Covered Positions to submit for expense reimbursement." Sett. Agmt. ¶ 59. It does not provide the Bank with a defense against other types of § 2802 claims, for example those alleging that the Bank is not complying with its reimbursement policy. *See id.*

8

1     Accordingly, the motion for approval of the Consent Decree is **GRANTED**.

2     C.     Attorneys' Fees and Costs

Class Counsel request an award of $3.3 million in attorneys' fees, or 30% of the settlement fund, in addition to $58,805.07 in out-of-pocket expenses. *See* Fee Mot. at 7, 14. "Where a settlement produces a common fund for the benefit of the entire class, courts have discretion to employ either the lodestar method or the percentage-of-recovery method" in awarding attorneys' fees. *Bluetooth Headset*, 654 F.3d at 942 (citation omitted). "Because the benefit to the class is easily quantified in common-fund settlements," courts may "award attorneys a percentage of the common fund in lieu of the often more time-consuming task of calculating the lodestar." *Id.* "Applying this calculation method, courts typically calculate 25% of the fund as the 'benchmark' for a reasonable fee award." *Id.* Because Class Counsel seek an upward departure from the benchmark, the Court must "provid[e] adequate explanation in the record of any 'special circumstances' justifying a departure." *Id.* "Factors courts consider in determining the reasonableness of a percentage-of-recovery award include: (1) the results achieved; (2) the risk of litigation; (3) the skill required and the quality of work; (4) the contingent nature of the fee and the financial burden carried by the plaintiffs; and (5) awards made in similar cases." *Viceral v. Mistras Grp., Inc.*, No. 15-CV-02198-EMC, 2017 WL 661352, at *3 (N.D. Cal. Feb. 17, 2017) (citation omitted).

Of these factors, the first—the results obtained for the class—is the "most critical." *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983). The Court recognizes that "class counsel have obtained favorable settlement terms in this case because . . . the proposed monetary settlement amounts to approximately half of the maximum potential recovery at trial, and Class Members still employed by as loan officers by Defendant are anticipated to benefit substantially from the consent decree that is part of the settlement." Docket No. 72 at 13. The Ninth Circuit has instructed that "courts should consider the value of the injunctive relief obtained as a 'relevant circumstance' in determining what percentage of the common fund class counsel should receive as attorneys' fees." *Staton*, 327 F.3d at 974 (quoting *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1049 (9th Cir. 2002)). Thus, in *Vizcaino*, a class action lawsuit alleging denied employee benefits,

United States District Court
Northern District of California

the district court approved attorneys' fees of $27.1278 million, or 28% of the $96.885 million cash settlement fund, because the settlement also provided important non-monetary benefits. *Vizcaino v. Microsoft Corp.*, 142 F. Supp. 2d 1299, 1301 n.1 (W.D. Wash. 2001). Namely, the settlement allowed 3,000 class members to be converted "regular" employees entitled to receive employee benefits. *Id.* Class counsel estimated the value of the employee benefits to the 3,000 converted class members at $101.48 million. *Id.* Using this theoretical value as a reference point, the district court observed that if the $101.48 million was added to the cash fund, "the attorneys fees . . . constitute only 14% of the *total* common fund." *Id.* (emphasis in original). The Ninth Circuit affirmed, agreeing that "non-monetary benefits conferred by the litigation are a relevant circumstance" to weigh in evaluating a fee award. *Vizcaino*, 290 F.3d at 1049. *See also Ruch v. AM Retail Grp., Inc.*, No. 14-CV-05352-MEJ, 2016 WL 5462451, at *10 (N.D. Cal. Sept. 28, 2016) (accounting for "the economic value of the change in [overtime wages] policy" in approving an attorneys' fee request amounting to 30% of the monetary settlement fund).

Applying the same methodology here, Plaintiff estimates that if Class Members seek and receive reimbursements for all of their work-related mileage during the five years the Consent Decree is in effect, the Bank will pay out approximately $15 million in reimbursements. Fee Mot. at 11. Assuming the correctness of this figure, the total theoretical value of the settlement would be $26 million ($11 million in the cash fund + $15 million in future reimbursements). The $3.3 million fee request would then be 12.7% of the settlement value. Even if this estimate of the Consent Decree's value is overly optimistic, Class Members would only need to claim 14.7% of their mileage reimbursements over the next five years to add $2.2 million in value to the $11 million cash settlement. This would reduce the fee request to 25% of the total settlement value.[2] Thus, the combination of monetary and injunctive benefits obtained by Class Counsel support their fee request.

The second factor, the risk of litigation, also supports granting the requested fee. As noted

---

[2] The $15 million in theoretical value provided by the Consent Decree is based on Plaintiff's estimate that an MLO drives an average of 170 reimbursable miles a week. Fee Mot. at 11. If each Class Member claims reimbursements for 14.7% of these miles, the Bank will pay out $2.2 million in reimbursements over the next five years (*i.e.*, $15 million × 14.7%).

above, Class Members face substantial risk that further litigation might not result in any recovery at all, because they may not be able to persuade a jury that the Bank failed to exercise due diligence in reimbursing MLOs, and because they may have difficulty establishing their damages given the lack of mileage records.

The third factor, the skill required and the quality of work, weighs in favor of granting the requested fee, although not strongly. On the one hand, Class Counsel effectively secured certification of the class, and negotiated favorable settlement terms for Class Members. On the other, litigation in this case has not been especially extensive aside from class certification. Plaintiff did not face any motions to dismiss, for example, and discovery was not far-ranging. Once the class was certified, the parties engaged in and reached settlement without further motions practice. *See Parrish v. Manatt, Phelps & Phillips, LLP*, No. C 10-03200 WHA, 2013 WL 2405200, at *4 (N.D. Cal. May 31, 2013) ("The settlement of this case did require time and labor . . . , but litigation in this court terminated fairly early.").

The fourth factor, the contingent nature of the fee, favors granting the fee request. Class Counsel represent that they have expended over 1100 hours litigating this case over the past two-and-a-half years on a contingent-fee basis, with no guarantee of compensation. "The importance of assuring adequate representation for plaintiffs who could not otherwise afford competent attorneys justifies providing those attorneys who do accept matters on a contingent-fee basis a larger fee than if they were billing by the hour or on a flat fee." *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1047 (N.D. Cal. 2008).

The fifth factor, awards made in similar cases, supports approving a fee request in the neighborhood of 30%. As a general matter, courts have observed that "attorneys' fees in the amount of 30% of the common fund falls within the range of acceptable attorneys' fees in Ninth Circuit cases." *Ching v. Siemens Indus., Inc.*, No. 11-CV-04838-MEJ, 2014 WL 2926210, at *8 (N.D. Cal. June 27, 2014); *see Paul Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989) (noting that typically, in common fund class settlements, "fees awards range from 20 percent to 30 percent of the fund created"). More specifically, this Court approved attorneys' fees equivalent to 33% of the settlement fund in another case brought under Labor Code § 2802 for

11

unreimbursed work-related travel. *See Stuart v. Radioshack Corp.*, No. C-07-4499 EMC, 2010 WL 3155645, at *6 (N.D. Cal. Aug. 9, 2010) (noting that "the fee award represents one-third of the settlement amount," which is "well within the range of percentages which courts have upheld as reasonable in other class action lawsuits"). Another court approved a fee request for 30% of the settlement fund in a case bringing claims under § 2802. *See Ruch*, 2016 WL 5462451, at *10. Fee awards of 30% of the settlement fund are also common in wage and hour cases. *See, e.g.*, *Donald v. Xanitos, Inc.*, No. 3:14-CV-05416-WHO, 2017 WL 1508675, at *4 (N.D. Cal. Apr. 27, 2017); *Ching v. Siemens Indus., Inc.*, No. 11-CV-04838-MEJ, 2014 WL 2926210, at *8 (N.D. Cal. June 27, 2014).

The final step is to "use the lodestar method as a cross-check on the percentage method in order to ensure a fair and reasonable result." *Vizcaino*, 142 F. Supp. 2d at 1305. Class Counsel represents that their total lodestar is $855,450. *See* Docket Nos. 73-1 ¶¶ 9, 18; 73-2 ¶ 25; Fee Mot. at 14. The lodestar multiplier on the $3.3 million fee request is thus 3.86. This is on the high end of the range of multipliers typically approved. *See Vizcaino*, 290 F.3d at 1051 n.6 (finding, based on a review of 24 common-fund cases, that 83% awarded a multiplier between 1.0–4.0, and 54% awarded a multiplier between 1.5–3.0). "[C]ourts have discretion to apply a positive multiplier after considering factors such as: the quality of representation, the benefit obtained for the class, the complexity and novelty of the issues presented, and the risk of nonpayment." *In re TracFone Unlimited Serv. Plan Litig.*, 112 F. Supp. 3d 993, 1010 (N.D. Cal. 2015). As discussed above, these factors all weigh in Class Counsel's favor, but not emphatically. In monetary terms, $3.3 million in fees would represent a windfall for Class Counsel of almost $2.5 million over their lodestar, which raises some concerns. *See Bluetooth Headset*, 654 F.3d at 942.

On balance, the Court concludes that $3 million is a reasonable fee award. This amount represents 27.2% of the settlement fund and a lodestar multiplier of 3.5, and reflects the excellent results Class Counsel achieved on behalf of the class on the one hand, and the relatively low lodestar figure on the other.

Class Counsel's request for $58,805.07 in costs appears to have been reasonably incurred, and is $16,194.93 less than the $75,000 that was initially set aside from the settlement fund for

costs. *See* Docket Nos. 73-1 ¶ 19, 73-2 ¶ 28; Fee Mot. at 14. The difference will be returned to the settlement fund for distribution to Class Members. Fee Mot. at 13. Class Counsel is entitled to "recover as part of the award of attorney's fees those out-of-pocket expenses that would normally be charged to a fee paying client." *Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994) (internal quotation marks omitted).

Accordingly, Plaintiff's motion for attorneys' fees and costs is **GRANTED** in the amount of $3,000,000 in fees and $58,805.07 in costs.

D. <u>Incentive Award</u>

Ms. McLeod requests an incentive award of $15,000. The Ninth Circuit has explained that incentive awards "are intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 958–59 (9th Cir. 2009). An incentive award must be "reasonable," and the Court "must evaluate their awards individually, using 'relevant factors includ[ing] the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, . . . the amount of time and effort the plaintiff expended in pursuing the litigation . . . and reasonabl[e] fear[s of] workplace retaliation." *Staton*, 327 F.3d at 977 (quoting *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998)) (alterations in original).

In granting preliminary approval of the Settlement Agreement, the Court reduced the incentive award to Ms. McLeod to $7,500 because she had "not asserted that she has expended a particularly significant amount of time and effort in this case, or that she may be subject to workplace retaliation for her role in bringing the litigation," as *Staton* requires. Ms. McLeod now renews her request for a $15,000 incentive award, and this time has submitted a declaration providing facts that support an enhanced incentive award. Docket No. 73-4 ("McLeod Decl.").

As to the first two *Staton* factors, this Court has acknowledged that "[a]s the only Named Plaintiff in this action, Ms. McLeod has undoubtedly advanced the interests of the class and benefitted Class Members by securing this settlement agreement, especially given that many Class Members have asserted that they previously were not even aware their mileage could be expensed

13

under the [Bank]'s written policy." Docket No. 72 at 14 (citation omitted). This weighs in favor of an incentive award, although not necessarily one in excess of the $5,000 award that is considered "presumptively reasonable" in this District. *Villegas v. J.P. Morgan Chase & Co.*, No. CV 09-00261 SBA EMC, 2012 WL 5878390, at *7 (N.D. Cal. Nov. 21, 2012).

With respect to the third *Staton* factor, Ms. McLeod states that she has "spent a total of approximately 65 to 75 hours in assisting with the prosecution of this action." McLeod Decl. ¶ 4. This includes: "two to three hours assisting with the pre-lawsuit investigation," including being interviewed by counsel, searching for emails and documents regarding the Bank's mileage reimbursement practices, and identifying other potential witnesses; three to four hours identifying additional witnesses and documents "from the time the case was filed until there was a tentative settlement reached"; approximately 20 hours to participate in the full-day mediation on December 16, 2016, which required travelling from Southern California to San Francisco and missing two days of work; one to two hours preparing a declaration in support of the motion for class certification in October 2017; approximately 17 hours preparing for, traveling to, sitting for, and reviewing a deposition on October 18, 2017 that required missing one and a half days of work; approximately 20 to 25 hours participating in the settlement conference on May 18, 2018, which required missing a half day of work; and two to three hours reviewing the Settlement Agreement and conferring with counsel to amend its terms with respect to her individual wrongful termination claims against the Bank. *Id.* ¶¶ 5–11. Ms. McLeod states that she "lost income" as a result of the time she missed from work to attend to the case, "as she could not pursue commission-generating loan sales." Fee Mot. at 17.

Ms. McLeod's role in this litigation is similar to that of the named plaintiff in *Garner v. State Farm Mut. Auto. Ins. Co.,* No. CV 08 1365 CW (EMC), 2010 WL 1687832 (N. D. Cal. Apr. 22, 2010). There, the court approved a $20,000 incentive award, out of a settlement fund similar in size to this one, because the named plaintiff's involvement in the case was extensive, including being deposed twice and attending a full-day hearing. *Id.* at *17. The *Garner* court also took into account that "unlike many class actions, where there are several class representatives, each of whom are entitled to incentive awards, here there was just one." *Id.* Ms. McLeod is likewise the

14

sole Named Plaintiff here and her "commitment and contribution to this case have been considerable." *Id.* This factor thus supports an incentive award in excess of $5,000.

As for the last *Staton* factor, Ms. McLeod attests that she did not merely have a reasonable fear of workplace retaliation for initiating this lawsuit, but that she "believe[s]" the Bank in fact "terminated [her] employment in part due to [her] prosecution of the subject lawsuit." McLeod Decl. ¶ 3. She is "pursuing potential wrongful termination and discrimination claims arising out of that termination" with separate counsel, and that litigation is ongoing. *Id.*; *see id.* ¶ 2 ("Bank of America terminated my employment on September 22, 2017, while I was out on medical leave authorized by my primary care physician."). Although Ms. McLeod does not provide further details about the circumstances of her termination, the Ninth Circuit has sanctioned higher awards for class members who "demonstrate that they were in fact retaliated against—or at least make some credible allegation of past or possible future retaliation—based on their role in the lawsuit." *Staton*, 327 F.3d at 977. Courts have accordingly approved incentive awards in excess of $5,000 to named plaintiffs who have attested that they were targeted for retaliatory acts of varying degrees of severity. *See, e.g.*, *Palacios v. Penny Newman Grain, Inc.*, No. 114CV01804DADSAB, 2016 WL 8730677, at *12 (E.D. Cal. May 27, 2016) (approving $10,000 incentive award to one named plaintiff who "was terminated based on the suit against the defendants" whereas the other named plaintiffs received $5,000); *Brecher v. Citigroup Glob. Markets, Inc.*, No. 09-CV-1344-CAB (MDD), 2015 WL 13344782, at *5 (S.D. Cal. Feb. 6, 2015) (approving $10,000 incentive awards to three named plaintiffs who "state[d] that they have received negative comments from managers for participating in th[e] lawsuit").

In light of the new information Ms. McLeod has provided regarding the substantial amount of time she has committed to this litigation and her alleged wrongful termination by the Bank as a consequence of that commitment, the Court finds that an exceptional incentive award is justified. Accordingly, Ms. McLeod's request for a $15,000 incentive award is **GRANTED**.

///

///

///

### III. CONCLUSION

For the foregoing reasons, parties' motion for final approval of the Settlement Agreement and the Bank's motion for approval of the Consent Decree are **GRANTED**. Plaintiff's motion for attorneys' fees and costs is **GRANTED** in the amount of $3,000,000 in fees and $58,805.07 in costs, and her request for an incentive award is **GRANTED** in the amount of $15,000.

This order disposes of Docket Nos. 73, 74, and 75.

**IT IS SO ORDERED**.

Dated: March 13, 2019

EDWARD M. CHEN
United States District Judge